FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2012 MAR -5 AM 10: 43

CLERK [signature] moore
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

CHARLES W. WALKER, SR.,          )
                                 )
        Petitioner,              )
                                 )
v.                               )          CASE NO. CV109-036
                                 )
UNITED STATES OF AMERICA,        )
                                 )
        Respondent.              )
_____)

## O R D E R

Before the Court is Petitioner Charles W. Walker's Amended 28 U.S.C. § 2255 Petition. (Doc. 8.)[1] For the reasons that follow, the Petition is **DENIED**.[2] The **Clerk of Court** is directed to **CLOSE THIS CASE**.

## BACKGROUND

I.   The Indictment

On June 23, 2004, Petitioner was charged in a 142 count indictment alleging numerous fraudulent schemes and tax evasion. (CR104-059, Doc. 1.) For the schemes, Petitioner was charged with violations of 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), and 1346 (honest services). (Id.)

---

[1] References to documents on the criminal docket will be preceded by CR104-059. References to documents on the docket of this case will be referred to by document number only.

[2] Petitioner requested an evidentiary hearing. (Doc. 8 at 10.) For the reasons stated in this order, an evidentiary hearing is unnecessary. Therefore, Petitioner's request is **DENIED**.

The first scheme was a conspiracy to defraud businesses advertising in Petitioner's newspaper, the Augusta Focus ("the Focus"). (CR104-059, Doc. 1 at 9-19.) Specifically, Petitioner over-charged advertisers in the Focus based on grossly exaggerated circulation numbers, which he knew to be false. (Id. at 9.) Additionally, Petitioner ordered a fictitious independent circulation audit to falsely substantiate the inflated numbers. (Id. at 13-14.)

In the second scheme, Petitioner traded political favors to Grady Hospital ("Grady") in exchange for Grady using Georgia Personnel Services ("GPS"), Petitioner's temporary services agency.[3] (Id. at 20-21.) Petitioner accomplished this by extracting promises from Grady to use GPS while he delayed the passage of House Bill ("HB") 765.[4] (Id. at 22-24.) To hide the scheme, Grady employed a phony bidding process when awarding GPS approximately $2.5 million in contracts. (Id. at 23-25.)

Petitioner's third scheme involved hiding his ownership of GPS and the Focus from the Medical College of Georgia ("MCG")—a state entity. (Id. at 27-32.) This was done to convince MCG that business relationships between MCG, GPS,

---

[3] Petitioner was acquitted of one of the nine counts charged in this scheme. (CR104-059, Doc. 166.)

[4] HB 765 was extremely important to Grady, and other hospitals, as it dealt with Medicare funding. (CR104-059, Doc. 1 at 22; id., Doc. 155 at 1195-98, 1237.)

and the Focus did not violate a state law proscribing business between State entities and politicians. (Id. at 28-32.)

The fourth scheme charged Petitioner with using campaign funds for personal ends. (Id. at 34-35.) Those uses included paying gambling debts, giving money to a friend's romantic interest, and purchasing family gifts.[5] (Id. at 37-39.)

The fifth scheme alleged a conspiracy to defraud the C.S.R.A. Classic, Inc.: A Charity Intended for the Benefit of Young People ("CSRA"), which was created to provide college scholarships to low income individuals. (Doc. 1 at 42, 45.) Each year, CSRA held a fund-raising weekend, called the Classic, that included a college football game, Greek step show, and golf tournament. (Id.) The CSRA kept records for advanced ticket sales. (Id. at 46-50.) However, Petitioner retained over $100,000 in money raised by selling tickets on game-day in unrecorded, cash only transactions. (Id.) In addition, Petitioner siphoned money from the CSRA by having his restaurant, BL's, charge CSRA not only the market rate of an upscale private caterer for participants' meals, but also requiring CSRA to pay for all costs of preparing the meals—

_____

[5] Petitioner was acquitted of four of the twelve counts under this scheme. (CR104-059, Doc. 166.)

labor, ingredients, service items, and even repairs to BL's itself. (Id. at 51-52.) Petitioner had many other schemes to steal from the CSRA as well. (Id. at 51-56.) Relatedly, Petitioner was charged with the preparation of a charitable corporation's fraudulent tax return for his work on CSRA's taxes.[6] (Id. at 64-65.)

## II. Motion to Dismiss for Selective Prosecution

Numerous pretrial motions were filed in this case. Of particular import is the "Motion to Dismiss Based on Governmental Misconduct and Selective Prosecution."[7] (CR104-059, Doc. 50.) This motion alleged "improper political motivations that prompted both the initiation of this prosecution and the decision to indict." (Id. at 1.) It contended that the "First and Fifth Amendment[s]" required dismissal of the indictment because United States Attorney, Rick Thompson, prosecuted Petitioner for political gain.[8] (Id. at 1-2.)

---

[6] Petitioner was also charged with personal tax fraud (CR104-059, Doc. 1 at 62-65), but was acquitted (CR104-059, Doc. 166).

[7] The exact nature of this motion is discussed in more detail below. See infra Analysis I.A.

[8] Petitioner's main factual support for this assertion was that Thompson was "expressly sanctioned by the Department of Justice for engaging in official conduct that was improperly motivated by political considerations." (CR104-059, Doc. 50 at 6.)

The motion was referred to Magistrate Judge Barfield, who determined that Petitioner failed to make the threshold showing required for discovery on a claim of selective prosecution.[9] (CR104-059, Doc. 80 at 15.) Specifically, the Magistrate Judge found that Petitioner had "utterly failed to make the 'credible showing' that 'similarly situated individuals . . . . were not prosecuted.' " (Id. at 10 (quoting United States v. Bass, 536 U.S. 862, 863 (2002)) (alteration in original).) Further, the Magistrate Judge determined that Petitioner "offer[ed] no evidence that the Government [] acted irrationally, capriciously, or for constitutionally impermissible reasons." (Id. at 12.)

Petitioner did not object to the Report and Recommendation, which was adopted by District Court Judge Bowen. (CR104-059, Doc. 90.) The issue was not raised on appeal. United States v. Walker, 490 F.3d 1282 (11th Cir. 2007).

III. Jury Selection

Jury selection was an arduous affair. It began when the Government sought a district-wide venire, excluding the

_____

[9] In the Report and Recommendation, the Magistrate Judge applied a two part test to determine whether discovery was permitted. (CR104-059, Doc. 80 at 5.) The test required Petitioner to show a colorable basis that (1) similarly situated individuals were not prosecuted and (2) the government acted in bad-faith in prosecuting Petitioner. (Id.)

5

Augusta Division, or a change of venue due to pretrial publicity. (CR104-059, Doc. 56.) Petitioner opposed this motion, seeking a venire from only the Augusta Division. (CR104-059, Doc. 59.) Judge Bowen crafted a compromise—a venire drawn from the entire district, _including_ the Augusta division. (CR104-059, Doc. 93.) In so doing, Judge Bowen explicitly rejected the allegations of pervasive pretrial publicity as "too speculative to give this Court a sound basis to exclude persons who live in the same judicial division in which a large part of the alleged criminal acts occurred." (_Id._ at 2.)

Jury selection was a twelve-hour ordeal.[10] (CR104-059, Doc. 153.) The potential jurors were first questioned as a panel. (_Id._ at 54-60.) Nearly forty jurors were then questioned individually and any showing a hint of bias against Petitioner were removed.[11] For example, jurors were excused for political work opposing Petitioner (_id._ at 187-88), bias (_id._ at 168), prejudgment based on a summary of the

---

[10] Jury selection was completed over the course of a single day to minimize the inconvenience of long-distance travel on venire members not selected for service. (CR104-059, Doc. 153 at 288.)

[11] While Judge Bowen rejected two of Petitioner's objections for cause, neither dealt with individual bias towards Petitioner. (Doc. 153 at 209-12.) Instead, the rejected challenges were based on a juror's law enforcement background, and a juror's inability to understand large words. (_Id._)

indictment (id. at 175), and prejudgment based on the volume of charges (id. at 170-71). Meanwhile, jurors appearing to favor Petitioner remained on the panel over the Government's objections. (Id. at 205-08.) For example, Ms. Walton was allowed to remain despite expressing "a lot of admiration for [Petitioner]." (Id. at 195.) Ms. Brown, who stated that "[w]hen there are murders and child molesters still on [the] street I would hate to see [Petitioner] go to jail," was also allowed to remain. (Id. at 199.)

From the venire, thirty-six names were randomly pulled to form the panel. (Id. at 214.) Of these, fifteen were white males, eight were white females, one was a black male, ten were black females, and two could not be classified.[12] (Id. at 257.) These prospective jurors were questioned again, after which the striking process occurred. (Id. at 212-50.) The Government exercised five challenges, waiving its remaining strikes. (Id. at 251-52.) Petitioner exercised all fourteen strikes. (Id.)

Both sides then raised Batson challenges. All fourteen of Petitioner's strikes were against white males and all five of the Government's strikes were against minorities. (Id. at 256, 270.) Accordingly, both parties were required to

---

[12] The Court also pulled six additional names, should the thirty-six member panel be insufficient. (CR104-059, Doc. 153 at 214.)

articulate race-neutral reasons for each strike. (Id. at 255-73.) Judge Bowen then orally denied all of Petitioner's challenges and ten of the Government's fourteen challenges. (Id. at 278-82.) As a remedy for the four granted challenges, the racially-stricken jurors were reseated. (Id. at 282-83.) The final jury was racially mixed, consisting of three African-Americans and nine Caucasians.[13] The Batson rulings were upheld on appeal. Walker, 490 F.3d at 1289-96.

IV.  Trial

Petitioner's trial, which began on May 24, 2005, lasted approximately one week. (CR104-059, Docs. 154-157.) Attorneys Edward T.M. Garland and Thomas W. Tucker represented Petitioner.[14] (CR104-059, Doc. 154 at 8.) United States Attorneys Richard Goolsby, Patricia G. Johnson, and Stephen Marsh represented the Government. (Id.) The

---

[13] The Court has consulted the jury rolls and takes notice of the racial composition of Petitioner's petit jury. Additionally, all four alternates were Caucasian.

[14] Mr. Garland is a Member of the American College of Trial Lawyers, the International Academy of Trial Lawyers, and the American Board of Criminal Lawyers. Garland, Samuel & Loeb, P.C., Attorney Biography for Edward T. M. Garland (2009), available at: http://www.gsllaw.com/Bio/EdwardGarland.asp. Mr. Tucker, local counsel in this case, is a fellow of the American College of Trial Lawyers and a Georgia "Super Lawyer." Tucker, Everitt, Long, Brewton & Lanier, "Attorneys: Thomas W. Tucker," available at: http://www.augustalawoffice.com/tucker.html. This information is background only; counsel's reputation does not create an assumption of effective assistance of counsel.

Honorable Dudley H. Bowen, Jr., presided over the trial. (Id. at 1.)

A.   The Focus Counts

The evidence proving the Focus scheme was extensive. Countless witnesses, including law enforcement agents, defrauded corporate representatives, former Focus employees, and auditors, testified to the scheme. (Id. at 190-234, 251-65, 272-84, 289-307, 325-34, 343-56, 361-65, 366-71, 383-89, 389-91, 410-25, 430-35, 462-76, 492-94, 516-24, 538-50, 571-97; id., Doc. 155 at 884-85, 1114-19.) Particularly damaging was the testimony of a former employee whom Petitioner chastised for refusing to use false circulation numbers. (Id., Doc. 154 at 434-35.) Witnesses were cross-examined as to industry practices (id. at 401), lack of knowledge of Petitioner's personal involvement (id. at 307-18, 356-59, 365, 373-76, 389, 392, 426-29, 435-39, 483-86, 567-68, 622-23), technical flaws in their testimony (id. at 334-43, 612-14), and inconsistent grand jury testimony (id. at 267, 609-10, 615).

Petitioner also presented evidence on the Focus scheme during his case-in-chief. Frank Lane, a former circulation manager for the Focus, explained the terms circulation[15] and

---

[15] Circulation is the paid subscribership of a newspaper. (CR104-059, Doc. 156 at 2012.)

readership;[16] that readership was determined by multiplying circulation by an accepted readership number; and that the readership number for a weekly African-American newspaper was 4.5 persons per paper. (Id., Doc. 156 at 2012-13.) Mr. Lane then testified that when he told Petitioner that the term readership, as opposed to circulation, needed to be used when selling advertisements, Petitioner acquiesced. (Id. at 2015.) Petitioner also presented a handwriting expert who asserted that Petitioner's signature on documents linking him to the phony independent audit was not Petitioner's actual signature. (Id. at 1859.) Ultimately, Petitioner presented two defenses to the Focus counts: (1) a lack of personal involvement and (2) that his actions were acceptable under industry practices. (See id., Doc. 154 at 401 (claiming that Good Housekeeping Magazine uses inflated readership numbers); id., Doc. 156 at 2103-16; id., Doc. 157 at 2565-67 (discussing industry practices in closing arguments).)

B. CSRA Counts

The evidence on the CSRA counts was staggering. Employees, directors, football coaches, athletic directors, the stadium architect, accountants, security guards, ticket salesmen, representatives of corporate sponsors, and board

---

[16] Readership is paid subscribership plus others who read the paper. (CR104-059, Doc. 156 at 2013.)

members all testified to the frauds. (Id., Doc. 154 at 410-25, 477-83, 494-500; id., Doc. 155 at 644-84, 773-820, 850-57, 862-72, 873-81, 885-93, 901-15, 924-30, 940-76, 995-1008, 1017-26, 1034-43, 1046-49, 1051-56, 1063-68, 1071-77, 1077-95, 1105-08, 1119-21, 1124-28, 1130-32, 1132-37, 1139-40, 1142-45, 1146-49, 1150-53, 1154-58, 1159-61, 1163-73, 1174-78, 1180-87.) The testimony covered the lack of recordkeeping (id. at 658-59, 903, 907); the exclusion of board members from CSRA finances (id. at 652-55, 781, 794-97, 813-14, 890, 902, 1081-82, 1088, 1092); the overall scheme (id. at 644-51, 662-63, 854-55, 888-90, 950-65, 1164-73, 1175); large payments by the CSRA to BL's for participant meals despite the CSRA also paying for all input costs of the meals, such as labor, food, and facilities (id. at 666-67, 809-13, 855-60, 908, 1092-94, 1157); checks drawn to cash (id. at 678-79, 800-01, 965-73); extensive attendance of the Classic (id. at 777, 784, 886-88, 911-12, 1054, 1073-75); extensive sponsorship (id. 778-81); gambling debts paid from CSRA funds (id. at 974, 1042); and Petitioner's personal involvement (id. at 659, 866, 892, 1055, 1066-68). Cross-examination trod much ground as well, covering the Classic's costs (id., Doc. 155 at 487-90), reasons for Petitioner's tight control (id. at 685-87), uses of the Classic's proceeds (id. at 688-91, 824-25, 897-99, 1044-45, 1050), CSRA's

positive community contributions (<u>id.</u> at 692-94, 1189), factors for determining who received scholarships (<u>id.</u> at 696), Petitioner's contributions to the CSRA for which he was never reimbursed (<u>id.</u> at 710-11, 1109-11), free concessions at the Classic (<u>id.</u> at 730-32, 1141, 1149, 1153), free admission to the Classic (<u>id.</u> at 732-33, 827-38, 860, 1058-59, 1070, 1077-79), and lack of attendance at the Classic (<u>id.</u> at 735-38). Petitioner's counsel also cast aspersions on the credibility of the Government's witnesses (<u>id.</u> at 882-83, 916-17) and impeached a witness with prior grand jury testimony (<u>id.</u> at 501-03).

Petitioner's case-in-chief mirrored the cross-examination testimony. That is, Petitioner offered evidence of the Classic's costs (<u>id.</u>, Doc. 156 at 1954, 2058-59, 2064-68, 2083-85, 2145-49, 2172); reasons for payment by the CSRA to Petitioner's businesses (<u>id.</u> at 1958-59, 1965, 2033, 2118-19, 2158-61, 2190); the value of, and criterion for, the scholarships given by the CSRA (<u>id.</u> at 1957, 2049-51, 2080, 2182); the philanthropic goals of the charity (<u>id.</u> at 1966, 2030, 2011-16, 2180); free admissions and other aspects of gate operations at the Classic (<u>id.</u> at 1968, 2096, 2122-23, 2133-35, 2161-62; <u>id.</u>, Doc. 157 at 2218, 2238, 2242, 2259, 2275-77, 2278, 2332, 2349-53); free concessions at the Classic (<u>id.</u>, Doc. 156 at 1970-71; <u>id.</u>, Doc. 157 at 2206,

2218, 2254-56, 2356-58); lack of attendance at the Classic (id., Doc. 156 at 2037-38, 2191; id., Doc. 157 at 2254-56); theft of proceeds by a CSRA employee (id. at 2282-84); and impeachment of a prosecution witness (id., Doc. 157 at 2281-83).

C.   Grady Hospital

Evidence of the Grady scheme was less voluminous than that of the previous two schemes; however, it was equally compelling.  Testimony from a former state senator and high-ranking Grady human resource personnel established that Petitioner used HB 765 to secure business for GPS.  (Id., Doc. 155 at 1192-1214, 1237-61, 1296-1309, 1314-25, 1329.) The witnesses covered the Bill's importance to Grady (id. at 1195-98, 1237), Petitioner's comments about holding up the Bill to "massage" it (id. at 1199), meetings between Petitioner and Grady's CEO while the Bill was in Petitioner's Committee (id. at 1203), the subsequent hiring of GPS (id. at 1209-10, 1237-39, 1303-05, 1321), the phony bidding process used to legitimize the award of work to GPS (id. at 1242-43, 1301-05), Grady's continued use of GPS despite deficient performance (id. at 1322-24), and losses associated with Grady's use of GPS instead of in-house options (id. at 1240-41, 1246-47, 1257-58).  On cross-examination, trial counsel elicited testimony that claims of holding up the Bill were

overstated (id. at 1226), that "massaging" a bill does not suggest illegal activity (id. at 1229), that economic and other market forces required the use of GPS (id. at 1262, 1285, 1312-13, 1328), and that the bidding process was legitimate (id. at 1266, 1309). Counsel also impeached a witness with prior statements (id. at 1267) and otherwise questioned witnesses' credibility (id. at 1274, 1290).

Petitioner's case-in-chief covered much of the same ground as cross-examination, including market forces requiring Grady to outsource temporary work (id., Doc. 156 at 1828-33), the validity of the bidding process (id. at 1884), and Petitioner's conduct with respect to HB 765 (id. at 1909-15). Also, Edward Reford, Grady's CEO, stated that Petitioner never used political influence to generate business for GPS. (Id. at 1795.)

D. MCG Counts

Similar to the Grady scheme, the evidence on the MCG counts was not copious, but it was compelling. It included testimony from the former President of MCG, the former legal advisor to MCG, the editor of the Focus, and a reporter from the Atlanta Journal Constitution. (Id., Doc. 154, 600-01; id., Doc. 155 at 1330-34; id., Doc. 156 at 1342-66, 1374-80.) These witnesses testified to Petitioner's continued attempts to establish business relationships between his businesses

and MCG, despite his knowledge that to do so would violate the law (id. at 1361-66); MCG's warnings on the same (id. at 1346-47); Petitioner's repeated lies about his ownership of the Focus (id., Doc. 154 at 600-01; id., Doc. 156 at 1349, 1354); MCG's specific reliance on Petitioner's claim that he did not own the Focus when placing ads therein (id. at 1361); and Petitioner's misrepresentations about his ownership of GPS (id. at 1365, 1377-78). Especially damning were the meticulous records of correspondence between Petitioner and MCG kept by MCG's counsel, including letters warning Petitioner that should he or his wife own a share of either the Focus or GPS, Petitioner would be violating state law. (Id. at 1342-66.) Equally damning was testimony by the Focus's editor, whom Petitioner ordered to sign a fraudulent letter claiming ownership of the Focus. (Id., Doc. 154 at 600-01.)

The defense could do little to counter this highly documented fraud. On cross-examination, counsel challenged the substance of Petitioner's representations to MCG (id. at 1368-70), indentified temporal disconnects between the warnings and actual business (id. at 1369), and highlighted flaws in a witness's logic (id. at 1380-81). Petitioner also presented evidence that he did not know of GPS's relationship with MCG (id. at 2388), that the amount of business

transacted was minimal (id. at 2388, 2553-56 (referencing documents in evidence)), and that Petitioner reported the business to the State (id. at 2554-57 (referencing documents in evidence)).

E.   Campaign Finances

The evidence of Petitioner's misuse of campaign funds was conclusive.   First, casino executives related Petitioner's "VIP" status, frequent large bets, high credit lines, and love for blackjack (id., Doc. 156 at 1385, 1404, 1452);[17] his gambling trips with Grady Cornish and Samarian Kimbrough (id. at 1389); and his gambling losses of nearly half a million dollars (id. at 1408).   Testimony was then given by a GPS executive close to Petitioner, the Director of Management Services with the Augusta Housing Authority, and a companion on the gambling trips—Ms. Kimbrough.   This testimony covered the use of campaign funds to pay for a car and housing for Petitioner's nieces (id. at 1464, 1466, 1506-08), and pay for trips for Ms. Kimbrough (id. at 1531-33). Witnesses also testified that Petitioner transferred campaign funds to Ms. Kimbrough under false pretenses.   (Id. at 1535-

---

[17] The evidence of Petitioner's gambling habit was relevant not only to the campaign finance counts, which alleged that he spent money on a gambling trip, but also to the other counts because it was offered to establish where the money from the various fraudulent schemes was spent.   (CR104-059, Doc. 1.)

36, 1541-45.) Further buttressing the case was physical evidence of checks drawn on Petitioner's campaign account for these purposes.[18] (Id. at 1514 (checks paying niece's rent), 1538-44 (checks to S. Kimbrough).)

During cross-examination, the casino executives provided detailed explanations of casino practices. (Id. at 1392-99.) Also, they stated that Petitioner always paid his gambling debts (id. at 1400) and was only an occasional player, albeit for large sums of money (id. at 1426). As to the other witnesses, the GPS executive was impeached with grand jury testimony (id. at 1479), the Housing Authority executive was questioned on evictions (id. at 1518), and Ms. Kimbrough was questioned as to whether her receipts of campaign funds were valid (id. at 1551-55). During his case-in-chief, Petitioner called several witnesses who testified that Petitioner's expenditures were legitimate. (Id. at 1936, id, Doc. 157 at 2266, 2240-41, 2378-81, 2382-84.) Further, Defense counsel offered evidence that Petitioner had sufficient personal

---

[18] Several Internal Revenue Agents were also called to testify as to the tax fraud counts. However, the testimony is largely irrelevant to the current Petition because Walker was acquitted of the personal tax evasion charges and has not claimed ineffective assistance with respect to the CSRA tax charges. (CR104-059, Doc. 156 at 1559-1773). To the extent the testimony is relevant to this § 2255 Petition, it simply duplicates earlier witness testimony. (Id.) Similarly, the Government's two rebuttal witnesses are not discussed because they only reaffirmed previously introduced evidence. (Id. at 2403-19.)

money to pay his gambling debts and that personal, not campaign, funds may have been used to pay these debts. (Id. at 2324.)

Ultimately, the jury returned a verdict of guilty as to all of the conspiracy counts, all of the mail fraud counts with respect to the Focus, MCG, and CSRA; all but one of the mail fraud counts with respect to Grady; eight of the twelve mail fraud counts with respect to the campaign funds; and all of the tax counts pertaining to the fraudulent filing of the CSRA's tax return. (Id., Doc. 166 at 1.) Petitioner was acquitted of one of the Grady counts, four of the campaign finance counts, and all of the personal tax evasion counts. (Id. at 1.) Petitioner was sentenced to a term of 121 months imprisonment, a $12,700 special assessment, a $150,000 fine, and $698,046.89 in restitution. (Id., Doc. 166.)

V.    Appeal

After his trial, Petitioner appealed his conviction to the Eleventh Circuit Court of Appeals. Walker, 490 F.3d 1282. On appeal, Petitioner was represented by Marcia Gail Shein, Edward Garland, Donald Samuel, Thomas L. Hawker, and Dorothy Yates Kirkley. Id. at 1287. The Government was represented by Stephen K. Marsh and Edmund A. Booth, Jr. Id. Petitioner asserted four grounds for appeal:

> (1) during jury selection, the district court
> erroneously disallowed four of Walker's peremptory
> strikes after finding a Batson violation; (2)
> honest services mail fraud was improperly charged
> in the indictment and not supported by sufficient
> evidence; (3) prosecuting Walker for mail fraud
> violates basic principles of federalism; and (4)
> various sentencing enhancements were improperly
> imposed by the district court.

Id. The Eleventh Circuit affirmed Petitioner's conviction and sentence. Id.

## VI. Current Proceedings

Following his unsuccessful appeal, Petitioner filed a § 2255 Petition.[19] This initial petition reasserted his political prosecution claim and claimed ineffective assistance of counsel for (1) failure to move for recusal of the trial judge, (2) failure to move for a change of venue in spite of jury prejudice, (3) failure to interview or question witnesses, (4) failure to object to an onerous trial schedule, and (5) failure to object to sentencing errors. (Doc. 1.) Petitioner later filed an Amended Petition, which added a racial dimension to the political prosecution claim, fleshed out the grounds of ineffective assistance for failure to interview or question witnesses, and added a claim of

---

[19] This case was initially assigned to the Honorable Dudley J. Bowen, Jr., who recused himself because he found that an appearance of impropriety could accrue from ruling on the ineffective assistance of counsel claim respecting the failure to seek his recusal in the criminal trial. (Doc. 15.) Judge Bowen rejected the notion that the recusal was based on any actual bias on his part. (Id. at 2 n.2.)

ineffective assistance for failing to argue the as-applied constitutionality of the honest services statute. (Doc. 8.) Petitioner also filed a Brief in Support. (Doc. 9.) The Government responded that the selective prosecution claim was procedurally defaulted because it was not raised on appeal, and that the ineffective assistance of counsel claims were meritless.[20] (Doc. 17.) The Government also opposed Petitioner's request for an evidentiary hearing. (Id.) Petitioner responded that the selective prosecution claim was not procedurally defaulted. (Doc. 18.) The Court then held a hearing on the issue of procedural default to determine whether it should reach the merits of the selective prosecution claim. (Doc. 32.)

Following the hearing, this Court denied Petitioner's 28 U.S.C. § 2255 motion to vacate. (Doc. 33.) On appeal, however, the Eleventh Circuit vacated this Court's order and remanded the case with instructions to address whether counsel was ineffective for not arguing whether the factors supported an upward variance and whether the sentence was substantively reasonable. (Doc. 53 at 4.) Due to the lack of

---

[20] The Government provided an Affidavit from trial counsel. (Doc. 17, Ex. 1.) However, the Court did not use this Affidavit in arriving at its decision.

20

any argument on this claim in the record,[21] the Court directed the parties to brief the issue of whether appellate counsel was ineffective for failing to argue on appeal that the sentence was substantively unreasonable. (Doc. 57.)

**ANALYSIS**

## I.    Selective Prosecution

"Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir. 2004). "This rule generally applies to all claims, including constitutional claims." Id. However, "[t]he procedural-default rule is neither a statutory nor a constitutional requirement, [] it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments."[22] Massaro v. United States, 538 U.S. 500, 504 (2003). A petitioner can avoid the procedural default rule if he can establish "cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error," or that " 'a

---

[21] It is still the Court's opinion that Petitioner failed to properly raise this issue in his Amended Petition. (Doc. 57.)
[22] Based on Massaro, the parties in this case agree that the application of the rule is discretionary. (Doc. 32 at 6, 43.)

constitutional violation has probably resulted in the conviction of one who is actually innocent.' " *Lynn*, 365 F.3d at 1234 (quoting *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994)).

Petitioner argues that his selective prosecution claim is not procedurally defaulted. Petitioner contends that the purposes of the procedural default rule, as outlined in *Massaro*, are not served by the rule's application in this case and, alternatively, that cause and prejudice are established, excusing the default.[23] (Doc. 32 at 3.) In response, the Government contends that the application of the procedural default rule is justified in this case (id. at 43-44) and that Petitioner has failed to establish cause and prejudice (id. at 15-29).

A. Nature of the Selective Prosecution Claim

The nature of Petitioner's selective prosecution claim is nebulous at best. Factually, Petitioner has asserted that he was prosecuted because of his political affiliation.[24]

---

[23] Petitioner does not contend that he has established the second exception to the procedural default rule—a constitutional violation probably resulting the conviction of one who is actually innocent. (Doc. 32 at 3, 30.)

[24] The Amended § 2255 Petition incorporated this claim from the original Petition by reference. (Doc. 8 at 4.) Also, the Amended § 2255 Petition mentions, apparently for the first time, that Walker was selected for prosecution not only for political, but also racial reasons. (Compare id. at 4, with Doc. 1 at 5-17 and CR104-59, Doc. 50.) This allegation

22

(CR104-59, Doc. 50 at 1; CV109-36, Doc. 1 at 17; _id.,_ Doc. 30 at 6.) Legally, Petitioner first grounded this claim in _United States v. Armstrong_, 517 U.S. 456 (1996). (CR104-59, Doc. 50 at 1; CV109-36, Doc. 1 at 17; _id._, Doc. 30 at 6.) At the hearing, Petitioner's counsel asserted, for the first time, that this claim was cognizable instead as a vindictive prosecution claim under _United States v. Goodwin_, 457 U.S.

---

is wholly unexplained and unsupported. (Doc. 8 at 4.) Indeed, Petitioner has failed to even identify who prosecuted him for racial reasons. (_Id._)

The only other mention of race playing a role in this prosecution is contained in a letter from Petitioner's counsel to the United States House of Representatives. (Doc. 8, Attach. 1, Letter from Nathan Dershowitz to The Honorable John Conyers, Jr.) However, that letter contains nothing more than the naked assertion that Petitioner's trial judge had racist motives, a fallacious allegation implying racism on the part of not only the trial judge, but also the court of appeals judges upholding the complained of actions, see Walker, 490 F.3d 1282 (upholding the purportedly racist actions of which Petitioner's counsel complains), and irrelevant to the question of selective prosecution. See Oyler v. Boles, 368 U.S. 448, 455-56 (1962) (discussing selective prosecution with reference to the duties of "prosecuting authorities").

Ignoring the baseless and irrelevant nature of the far-reaching claims of a racist judiciary, counsel's own letter to Congress concedes that the factual and legal bases of this claim were known, and available, during trial and on appeal. (See Doc. 8, Attach. 1, Letter from Nathan Dershowitz to The Honorable John Conyers, Jr. (alleging that the trial judge misapplied Batson for racist reasons).) Thus, such a claim is clearly procedurally defaulted. Lynn, 365 F.3d at 1234-35. Accordingly, to the extent Petitioner seeks to assert a claim for a racially motivated prosecution, that claim is **DENIED** as facially insufficient and procedurally defaulted.

368 (1982),[25] or as a "targeting" claim as described by Justice Jackson in his famous speech at the Second Annual Conference of United States Attorneys on April 1, 1940, see Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. Crim. L. & Criminology 3 (1940). (Doc. 32 at 10-12.) Despite the lateness of these arguments, the Court will consider their merits as moorings for Petitioner's selective prosecution claim.

### i. Vindictive Prosecution

Petitioner's Goodwin argument attempts to change the selective prosecution claim into a vindictive prosecution claim. The line of cases addressing prosecutorial vindictiveness begins not with Goodwin but with Blackledge v. Perry, 417 U.S. 21 (1974). In Blackledge, the Supreme Court extended the presumption of vindictiveness, previously applied only to sentencing judges,[26] to prosecutors. Id. at

---

[25] To the extent that Petitioner is suggesting that the Court can apply the presumption of vindictiveness contained in Goodwin, 457 U.S. 373-75, to an Armstrong analysis, Petitioner is mistaken. Goodwin and Armstrong are distinct claims that are not to be conflated. Compare Goodwin, 457 U.S. at 372 (identifying a claim for "punish[ing] a person because he has done what the law plainly allows him to do"), with Armstrong, 517 U.S. at 464 (identifying claim where "the decision whether to prosecute . . . [is] based on an 'unjustifiable standard such as race, religion, or other arbitrary classification' " (quoting Oyler, 368 U.S. at 456)).

[26] Prior to Blackledge, the presumption of vindictiveness was only available with respect to sentencing judges. See North

27-28. Specifically, the Blackledge Court applied the presumption of vindictiveness to a prosecutor's decision to file additional charges when a criminal defendant successfully appealed his conviction. Id.

Blackledge is a limited prophylactic rule to prevent prosecutorial vindictiveness at the post-conviction stage. Smith, 490 U.S. at 800 n.3. Therefore, the circumstances to which Blackledge applies are very narrow. Id. For example, it does not reach pretrial prosecutorial decisions to modify charges. Id. (citing Goodwin, 457 U.S. at 384, Bordenkircher v. Hayes, 434 U.S. 357 (1978)); see also United States v. Weaver, 245 Fed App'x 946, 947 (11th Cir. 2007) ("[A] prosecutor violates a defendant's due process rights when additional charges are added as retaliation 'for exercising statutory or constitutional rights.' " (quoting United States v. Spence, 719 F.2d 358, 361 (11th Cir. 1983))). And, Petitioner has shown no case, and this Court's review has found none, where a Court applied Blackledge to a decision to initiate prosecution.

Here, the charges against Petitioner were never modified, much less modified post-trial, and Petitioner has not identified any other prosecutorial conduct covered by

Carolina v. Pearce, 395 U.S. 711 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989).

Blackledge.  Instead, he asserts that the initial decision to prosecute was impermissibly based on his political affiliations.[27]  (Doc. 1 at 5-17.)  Such a claim is not cognizable under Blackledge and its progeny.  See Blackedge, 417 U.S. 21; see also Smith, 490 U.S. at 800 n.3.  Accordingly, to the extent Petitioner seeks to assert a vindictive prosecution claim, it is **DENIED**.

### ii.  Targeting Claim

Petitioner contends that there is a special sub-class of Armstrong claims grounded in a speech given by Justice Jackson, known as "targeting" claims.  This subclass is recognized by Petitioner's attorney, but not the law.

Petitioner finds this claim in a famous speech delivered by Justice Jackson at the Second Annual Conference of United States Attorneys on April 1, 1940, and subsequently published in the Journal of the American Institute of Criminal Law & Criminology.  Robert H. Jackson, The Federal Prosecutor, 31 Am. Inst. Crim. L. & Criminology 3 (1940).  In that speech, Justice Jackson, then the Attorney General of the United States, stated:

---

[27] It is axiomatic that one does not exercise a constitutional or statutory right under the meaning of Blackledge simply by virtue of joining a political party.  Rather, Blackledge pertains to procedural constitutional rights, such as the right to appeal, to which vindictive prosecutors may respond by increasing charges.  Smith, 490 U.S. at 800 n.3.

> With the law books filled with a great assortment
> of crimes, a prosecutor stands a fair chance of
> finding at least a technical violation of some act
> on the part of almost anyone. In such a case, it
> is not a question of discovering the commission of
> a crime and then looking for the man who has
> committed it, it is a question of picking the man
> and then searching the law books, or putting
> investigators to work, to pin some offense on him.
> It is in this realm—in which the prosecutor picks
> some person whom he dislikes or desires to
> embarrass, or selects some group of unpopular
> persons and then looks for an offense, that the
> greatest danger of abuse of prosecuting power lies.

Id. at 5. On this basis, Petitioner asserts that there is something special about "targeting" claims that weakens Armstrong's strictures. (Doc. 32 at 48-49; Doc. 26 at 6.)

However, Petitioner cites no supporting case law for this novel contention, and this Court's review has found none. That claims for selective prosecution and Justice Jackson's speech have coexisted for over fifty years without any differentiation is especially telling. See Oyler, 368 U.S. at 456 (disallowing prosecutions based on "an unjustifiable standard such as race, religion, or other arbitrary classification"), Jackson, supra, at 5. Indeed, while rarely cited in judicial opinions, when mentioned the speech is understood not to establish a special judicial claim and remedy, but rather to imply that "[u]nder our system of government, the primary check against prosecutorial abuse is a political one." Morrison v. Olson, 487 U.S. 654,

728 (1988) (Scalia, J., dissenting); accord Dretke v. Haley, 541 U.S. 386, 399 (2004) (Kennedy, J., dissenting) ("The rigors of the penal system are thought to be mitigated to some degree by the discretion of those who enforce the law."). Accordingly, the Court declines to find that Justice Jackson's speech creates a distinct subclass of selective prosecution claims. As there is no difference between a "targeting" claim and other selective prosecution claims, analysis beyond a normal Armstrong inquiry is not required here.

### B. Procedural Default

It is well-established that a claim not raised on direct appeal or at trial is procedurally defaulted. Bousley v. United States, 523 U.S. 614, 622 (1998), United States v. Frady, 456 U.S. 152, 165-69 (1982), Lynn, 365 F.3d at 1234. Here, both parties agree that the selective prosecution claim was not raised on appeal. (Doc. 32 at 6-7, 17.) Accordingly, the claim is procedurally defaulted.[28]

---

[28] Petitioner seems to contend that the procedural default rule is inapposite where the factual or legal basis of a claim is not available at the time of appeal. (Doc. 26 at 6-7, Doc. 32 at 6-9.) That is, he contends that an issue need only be raised on appeal when "its merits can be reviewed without further factual development." (Doc. 32 at 6.) This assessment of the law is incorrect. The unavailability of the factual or legal basis of a claim at the time of appeal does not render procedural default inapplicable, rather it establishes cause under the cause and prejudice exception to

C.   Discretionary Application of the Rule

In _Massaro v. United States_, 538 U.S. at 504, the Supreme Court exempted ineffective assistance of counsel claims from procedural default. In so doing, the Supreme Court reasoned that "[t]he procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." _Id._ Seizing upon this language, Petitioner argues that, since _Massaro_, the dynamics of procedural default have changed significantly, making application of the rule discretionary. (Doc. 32 at 6.) The Government agrees. (_Id._ at 43.)

i. Massaro and Discretion

While the parties agree that _Massaro_ changed the dynamics of the procedural default rule to a case-by-case determination, nothing in the massive, sprawling progeny of _Massaro_ accords with that view. The Court has reviewed over two hundred cases citing _Massaro_, and none extended that case

the procedural default rule. _See_ _Reed v. Ross_, 468 U.S. 1, 15 (1984) ("[T]he failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met."), _Alderman v. Zant_, 22 F.3d 1541, 1551-52 (11th Cir. 1994). Accordingly, the Court will address the issue of the unavailability of the claim, factual and legal, when it addresses the application of the cause and prejudice exception.

beyond ineffective assistance claims. See, e.g., United States v. Hughes, 514 F.3d 15, 17 (D.C. Cir. 2008) (citing Massaro and barring claim of judicial bias without recognizing discretion to ignore procedural default rule absent proof of cause and prejudice), Berry v. Ray, 229 Fed. App'x 697, 699 (10th Cir. 2007) (unpublished) ("Massaro . . . simply provided that the failure to raise a claim of ineffective assistance of counsel on direct appeal does not cause a procedural default preventing review of the issue on collateral appeal."), Jones v. United States, 264 F. Supp. 2d 714, 716 (N.D. Ill. 2003) ("The Court in Massaro made clear, however, that ineffective assistance of counsel claims are an exception to this general rule, and 'may be brought in a collateral proceeding under § 2255, whether or not [the claim is procedurally defaulted].' " (quoting Massaro, 538 U.S. at 504)). Indeed, courts have even declined to extend Massaro to § 2254 petitions. See, e.g., Hayes v. Battaglia, 403 F.3d 935, 937 (7th Cir. 2005), Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir. 2003), Perkins v. Lee, 72 Fed. App'x 4, 4 n.1 (4th Cir. 2003) (unpublished). These cases lead to a singular conclusion: Massaro's exemption applies to ineffective assistance claims only.

The holding of Massaro squares with its progeny. That is, Massaro categorically exempted ineffective assistance

claims from procedural default rather than rendering the application of the procedural default rule discretionary. Massaro, 538 U.S. at 509 ("We do hold that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255.") To the extent Massaro could be read to impart discretion upon courts, such discretion would be at a higher level of generality than that urged upon the Court here. That is, Massaro could be, but has not been, read to grant courts discretion to categorically exempt classes of claims from procedural default. However, the Court, in accordance with the progeny of Massaro and the opinion itself, declines to hold that the Supreme Court actually conferred such discretion.[29]

_____

[29] Even assuming this Court has such categorical discretion, the Court would decline to exercise it here because there is no persuasive reason why selective prosecution claims are better raised on collateral attack than on direct appeal. Indeed, circuit courts regularly find such claims procedurally defaulted. See, e.g., Washington v. Renico, 455 F.3d 722 (6th Cir. 2006), United States v. Benally, 187 F.3d 649, at *1 (9th Cir. 1999) (unpublished table decision), United States v. Lewis, 113 F.3d 1247, at *1 (10th Cir. 1997) (unpublished table decision), Welsh v. Holt, 78 F.3d 580, at *6 (4th Cir. 1996) (unpublished table decision), Mills, 36 F.3d at 1055-56 (recognizing that procedural default applies to selective prosecution claims). By contrast, ten circuit courts and many state courts had already held procedural default inapplicable to ineffective assistance claims by the time of Massaro. 583 U.S. at 504, 508. Finding no support for the categorical exemption of selective prosecution claims

ii.  Application of Discretion

Even assuming, as the parties do, that Massaro mandates a case-by-case inquiry into the applicability of procedural default, the bar is applicable here.  Massaro rests on two separate rationales: (1) the inevitability that the trial record will be insufficient on direct review to consider an ineffective assistance claim and (2) the reality that the district court is the best forum to develop the missing facts.[30]  Massaro, 538 U.S. at 504-05.  The Court considers each rationale in turn.

The first rationale in Massaro was that "[w]hen an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." 538 U.S. at 504-05.  There are

from procedural default, the Court declines to extend Massaro to this class of claims.

[30] In rejecting the rule requiring appellate counsel to raise ineffective assistance claims on appeal, the Supreme Court offered several additional rationales: (1) the problematic situation of forcing appellate counsel to argue trial counsel's incompetence despite the necessity of a close relationship between the two, (2) the perverse incentives that result from requiring appellate counsel to consistently raise a frivolous claim, and (3) inefficiencies resulting from district courts determining if ineffective assistance claims are procedurally defaulted.  Massaro, 538 U.S. at 506-07.  However, these concerns are highly specific to ineffective assistance claims and have no applicability to review of selective prosecution claims.  Id.

numerous reasons why a trial record would lack sufficient factual development to allow meaningful review of an ineffective assistance claim on appeal. The trial record "may reflect the action taken by counsel but not the reasons for it" and "evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced."[31] Id. at 505.

None of the reasons why the record would be insufficient to review an ineffective assistance claim on appeal apply here. That is, relevant reasoning by counsel is on the record and conflicts of interest among attorneys have no bearing on the claim's merits. Stated affirmatively, the merits of this claim were directly addressed at trial to the extent permissible, perfecting the record for appeal. Although Petitioner was denied pretrial discovery pursuant to Armstrong, the denial of discovery—and thereby the selective prosecution claim—was an appealable issue.[32] Accordingly, the

---

[31] Although not stated in Massaro, the pragmatic concern that ineffective counsel is unlikely to develop the record as to his or her own incompetence further supports exempting ineffective assistance claims from the procedural default rule.

[32] Petitioner's contention that there was insufficient factual development to rule on the merits of the claim misses the point. At trial, Petitioner failed to prove sufficient facts to entitle him to discovery, much less that he was the victim of a selective prosecution. That predicate factual

first rationale of <u>Massaro</u> does not support the exercise of discretion here.

The second rationale in <u>Massaro</u> was the superiority of district courts as a forum for the litigation of ineffective assistance claims. 538 U.S. at 505-06. Specifically, the district court is the preferable venue because "the § 2255 motion often will be ruled upon by the same district judge who presided at trial," meaning the judge "should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." <u>Id.</u> at 506. This advantage is likely unique to a claim of ineffective assistance of counsel. However, even if it is not, it is inapplicable to selective prosecution claims. That is, the trial judge is in no better position to determine the prosecutor's motives on collateral review than an appellate judge on direct appeal.

---

determination could easily have been reviewed on appeal. To be sure, many circuits, including the Eleventh Circuit, have established standards of review for the denial of a discovery request relating to a selective prosecution claim. <u>See, e.g.</u>, <u>United States v. Quinn</u>, 123 F.3d 1415, 1425-26 (11th Cir. 1997) ("We review a trial court's denial of a request for discovery relating to a selective prosecution claim for abuse of discretion."), <u>United States v. Bourgeois</u>, 964 F.2d 935, 937 (9th Cir. 1992), <u>United States v. Heidecke</u>, 900 F.2d 1155, 1159 (7th Cir. 1990). It is difficult to understand why these standards exist if the denial of discovery for a selective prosecution claim is effectively unreviewable on appeal.

Accordingly, this rationale does not suggest that procedural default is inapplicable to this selective prosecution claim.

As the reasoning in Massaro suggests procedural default to be applicable here, the Court determines that the selective prosecution claim is procedurally defaulted. As such, the Court turns to the question of whether cause and prejudice have been established, thereby excusing the procedural default.[33]

D.   Cause and Prejudice

Procedural default can be excused upon a showing of "cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error." Lynn, 365 F.3d at 1234 (emphasis omitted). Petitioner contends that he has made this showing. (Doc. 32 at 3.) The Government disagrees. (Id. at 25.)

i.   Cause

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with [a] procedural rule." Murray v.

---

[33] Petitioner does not contend that he can satisfy the second exception to the procedural default rule—that " 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' " Lynn, 365 F.3d at 1234-35 (quoting Mills, 36 F.3d at 1055). Accordingly, the Court does not address the second exception.

Carrier, 477 U.S. 478, 488 (1986). Cause can be established by "showing that the factual or legal basis for a claim was not reasonably available to counsel or that 'some interference by officials' made compliance impracticable." Id. (quoting Brown v. Allen, 344 U.S. 443, 486 (1953)) (internal citations omitted). A claim is available on direct appeal if "its merits can be reviewed without further factual development."[34] Mills, 36 F.3d at 1055. However, "[i]f what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant." McCleskey v. Zant, 499 U.S. 467, 498 (1991), Amadeo v. Zant, 486 U.S. 214, 222 (1988). That is, "[o]mission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim." McCleskey, 499 U.S. at 498; see also Lynn, 365 F.3d at 1235 ("[T]he question is not whether . . . new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was available at all."). Here, Petitioner alleges that

---

[34] As noted previously, Petitioner's argument that the factual basis for a selective prosecution claim was unavailable because the trial court denied discovery on the claim is erroneous. See supra note 31. The claim was sufficiently developed for the Eleventh Circuit to review the predicate factual question as to the showing required for discovery. The failure to raise the discovery issue is tantamount to failing to raise the merits of the underlying selective prosecution claim. Id.

the factual basis for his claim was not available at the time of appeal.[35]  (Doc. 26 at 7-11.)

Here, the factual basis of Petitioner's claim was available to him at the time of trial and on appeal.[36]  The selective prosecution claim asserted at trial had the following factual bases: (1) "improper political motivations [] prompted both the initiation of this prosecution and the decision to indict;" (2) "[t]he moving force behind this prosecution included Senator Walker's political opponent, Don Cheeks, and the former U.S. Attorney, Rick Thompson, whose politically motivated misconduct in office resulted in his resignation;" (3) "no record that any Republican legislator or elected official in Georgia has ever been prosecuted by the federal government for any state Ethics Law violation;"

---

[35] While unclear, it seems that Petitioner is not asserting legal unavailability as cause for procedural default. (See Doc. 26 at 7-13.) To the extent that Petitioner does so, he is in error. At a minimum, to establish legal unavailability there must be an intervening change in the law. See Bousley, 523 U.S. 614. Petitioner points to no cogent change in law with respect to selective prosecution between his direct appeal and § 2255 Petition, and this Court is aware of none. Accordingly, the Court determined that the legal basis of the claim was available on appeal.

[36] Although muddled, Petitioner may be arguing that the factual basis of the Armstrong claim was available at trial, but not the factual basis of the "targeted" prosecution claim. (Doc. 26 at 10.) However, "targeting" claims are not distinct from other Armstrong claims. See supra Analysis I.A.ii. Accordingly, if the factual basis of the Armstrong claim was available at trial, changing the semantic incarnation of that claim from "selective" to "targeted" does not erase the availability of the underlying factual basis.

(4) the lack of prosecutions against others for overinflated claims of readership and circulation; (5) investigatory misconduct by the Georgia Bureau of Investigation and Federal Bureau of Investigation; and (6) the express sanction of U.S. Attorney Thompson by the Department of Justice for improperly engaging in politically motivated conduct related to someone other than Petitioner. (CR104-059, Doc. 50.) Currently, Petitioner asserts the following factual bases for the selective/targeted prosecution claim: (1) that Senator Don Cheeks and Congressman Charles Norwood "develop[ed] a strategy to dispose of me, Charles Walker; because it was their opinion that I had become too powerful;" (2) that Cheeks, Norwood, and United States Attorney Thompson created a list of persons to prosecute politically including "Georgia State Senator Van Street, Georgia Governor Roy Barnes and Speaker of the State House of Representatives, Terry Coleman" and Petitioner; (3) that Thompson was cited by the Office of Professional Responsibility for engaging in political prosecutions; (4) that various newspapers, his trial judge, and political opponents[37] conspired to ensure that Petitioner

---

[37] Paradoxically, Petitioner, an African-American Democrat, implicates current United States Attorney Ed Tarver, a fellow African-American Democrat, in the alleged racially and politically motivated prosecution. (Doc. 1 at 12.)

would be prosecuted and convicted;[38] (5) that Petitioner was convicted by a biased jury; (6) that Petitioner is "the only person in the history of the United States of America to be tried and convicted for allegedly overstating the readership/circulation of a small weekly newspaper;" and (7) that "[t]he United States House of Representatives has begun an investigation into serious accusations that the Department of Justice engaged in politically motivated prosecutions." (Doc. 1.)

At the highest level of generality, this claim is the same that Petitioner raised at trial. That is, at trial Petitioner alleged selective prosecution by U.S. Attorney Thompson for political reasons. (CR104-059, Doc. 50.) Currently, Petitioner alleges a selective prosecution by U.S. Attorney Thompson for political reasons.[39] (Docs. 1, 8.)

---

[38] The conspiracy alleged in the habeas petition reaches farther than that alleged at trial. Petitioner now implicates local newspapers, his trial judge, and political opponents. These new individuals neither served as prosecutors nor wielded prosecutorial power during Petitioner's criminal case. Accordingly, they cannot have selectively prosecuted Petitioner. See Oyler, 368 U.S. at 455-56 (discussing selective prosecution with reference to the duties of "prosecuting authorities"). Because the actions of these individuals cannot form an independent basis for a selective prosecution claim, facts pertaining to them simply add to the claim already asserted rather than creating a new claim.

[39] As noted above, to the extent Petitioner attempts to raise a separate selective prosecution claim based on race, such a claim is both facially insufficient and procedurally defaulted. See supra note 24.

That is, the two most important factual bases of a selective prosecution claim—who engaged in the prosecution and why they did so—remain constant between the two claims.

At a lower level of generality, the claims still bear a striking factual similarity. Compounding repeated factual assertions of who prosecuted him and why the prosecution was initiated are the repeated assertions that (1) Don Cheeks was the moving force behind the prosecution; (2) U.S. Attorney Thompson was cited for engaging in an unrelated improper political prosecution; and (3) Petitioner is the only person to be prosecuted for many of the crimes in his indictment.[40] (Compare CV109-036, Doc. 1, with CR104-059, Doc. 50.) Petitioner adds only a few new wrinkles to his claim: allegations of (1) additional non-prosecutorial parties involved in the conspiracy; (2) jury bias; and (3) Congressional action. (Doc. 1.)

Of Petitioner's new allegations, none differentiate his current selective prosecution claim from the original claim. With respect to the allegations of involvement by non-prosecutorial entities, these entities cannot have selectively prosecuted Petitioner themselves, and, therefore,

---

[40] It bears noting that Petitioner is wrong that his crime was unique. With respect to the prosecution for inflation of circulation numbers, there are cases analogous to his own. See United States v. Habhab, 132 F.3d 410 (8th Cir. 1997).

cannot form the basis of a separate selective prosecution claim.  See Oyler, 368 U.S. at 455-56.  For the same reason, Petitioner's allegations of jury bias do not create a new selective prosecution claim—even if Petitioner could prove jury bias, it would not entitle him to relief for selective prosecution.  Petitioner's allegations of Congressional action are equally unavailing.[41]  Even if Congress found that

---

[41] Petitioner's contention that Congress has uncovered a broad scheme of political prosecutions by the Bush White House, creating a new selective prosecution claim, fails for several reasons.  First, as Petitioner has stated, when Congress believes an individual has been selectively prosecuted "[t]hey refer the matter to the Justice Department asking for investigations . . . [and, i]n certain circumstances, special prosecutors have been appointed."  (Doc. 32 at 12.)  That is, Congress has its own manner of dealing with selective prosecutions, with which this Court declines to interfere.  Second, while Petitioner is free to come forward with any evidence discovered by Congress showing that Petitioner, personally, was prosecuted for political purposes, no such evidence has been proffered.  (See Docs. 1, 2, 8, 18, 26, 30.)  Third, and relatedly, the evidence Petitioner has brought forward amounts to little more than Congressional recognition that Petitioner's Counsel has argued to Congress that his client was prosecuted for political reasons.  (Doc. 26, Ex. 1, Allegations of Selective Prosecution: The Erosion of Public Confidence in Our Federal Justice System: Joint Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security and Subcomm. on Commercial and Administrative Law of the H. Comm. On the Judiciary, 110 Cong. 330 (2007) ("Senator Walker has a case that is on appeal.  His lawyers . . . in an October 22, 2007, letter, . . . have asked the Committee to take a look at this case . . . ."); Majority Staff of the H. Comm. on the Judiciary, 110th Cong., Allegations of Selective Prosecution in Our Federal Criminal Justice System 33-33 & n. 185 (Comm. Print 2008), available at http://judiciary.house.gov/hearings/pdf/ SelProsReport08041.pdf (listing Walker under heading "Other Cases Reported to Committee Staff" and basing the allegations

Petitioner was politically prosecuted, that would not change the factual basis of this claim from that which was asserted at trial—a prosecution by U.S. Attorney Thompson for political reasons.

It is clear, then, that Petitioner's current selective prosecution claim rests on the same factual basis as the selective prosecution claim raised at trial, meaning that the factual basis of the current claim was available on appeal. The new evidence, to the extent it exists, only elucidates and strengthens his former claim.[42] However, "[i]n procedural default cases, the question is not whether legal developments or new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was available at all." Lynn, 365 F.3d at 1235. Accordingly, Petitioner cannot establish cause for his default.[43] As a

_____

on a letter from Petitioner's Counsel to Chairman John Conyers, Jr.).) Petitioner's evidence that Congress has recognized his lawyer's allegations does not create a new claim for selective prosecution. To be sure, the congressional documents do not contain any indication that Congress has found, or even searched for, a single piece of evidence that Petitioner, himself, was politically prosecuted. Accordingly, the Congressional evidence does not create a novel claim for selective prosecution.

[42] The Court does not mean to suggest that Petitioner's selective prosecution claim is now strong or stronger. The Court does not reach the merits of the claim as it is procedurally defaulted.

[43] Although the Court need not reach the issue of prejudice in light of the failure to show cause, it bears noting that Petitioner may also be unable to establish prejudice, which

result, the procedurally defaulted selective prosecution claim is **DENIED**.[44]

## II.  Ineffective Assistance of Counsel

Petitioner also brings claims for ineffective assistance of counsel.  Specifically, Petitioner contends that his counsel (1) failed "to move to recuse the trial judge even though they knew he was personally biased against me;" (2) "failed to move for a change of venue even though they knew that with a district wide trial jury that I would be prejudiced because of the positions I had taken as an elected political official;" (3) "failed to interview witnesses who could have demonstrated the falseness of the testimony of Government witnesses and the fallacy of the Government's legal theory;" (4) "failed to object to the onerous trial schedule which left the lawyers fatigued and ineffective;" (5) failed to raise on appeal the Sentencing Judge's failure to explicitly consider each factor contained in 18 U.S.C. § 3553 during sentencing; (6) failed to challenge the

---

requires a showing that " 'the errors . . . worked to [Petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitution dimensions.' " Murray, 477 U.S. at 494 (quoting Frady, 456 U.S. at 170) (emphasis omitted).  It is unclear how the decision to institute a selective prosecution works to Petitioner's actual and substantial disadvantage at trial.

[44] Petitioner filed a motion for Discovery on the selective prosecution claim.  (Doc. 2.)  As that claim is procedurally defaulted, there is no need for discovery as to its merits.  Therefore, this motion is **DISMISSED AS MOOT**.

substantive reasonableness of the sentence imposed by the sentencing judge; (7) failed to impeach certain witnesses; and (8) failed to argue the unconstitutionality of 18 U.S.C. § 1346 as applied to Petitioner. (Docs. 1, 8.)

A. Legal Standard

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court created a two-part test for determining whether counsel's assistance was ineffective. "First, the [petitioner] must show that counsel's performance was deficient." Id. That is, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment." Id. Second, a petitioner must demonstrate that the defective performance prejudiced the defense to such a degree that the results of the trial cannot be trusted. Id.

Under the performance prong, the reasonableness of an attorney's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. Id. at 690. And, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689 (quoting

_Michel v. Louisiana_, 350 U.S. 91, 101 (1955)).  Indeed, a petitioner must show that " 'no competent counsel would have taken the action that his counsel did take.' " _Ford v. Hall_, 546 F.3d 1326, 1333 (11th Cir. 2008) (quoting _Chandler v. United States_, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)).

Under the prejudice prong, the petitioner must establish that there was a reasonable probability that the results would have been different but for counsel's deficient performance.  _Kimmelman v. Morrison_, 477 U.S. 365, 375 (1986), _Strickland_, 466 U.S. at 696.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  _Strickland_, 466 U.S. at 694; accord _Lightbourne v. Dugger_, 829 F.2d 1012, 1022 (11th Cir. 1987), _Boykins v. Wainwright_, 737 F.2d 1539, 1542 (11th Cir. 1983).

The same _Strickland_ test applies to claims of ineffective assistance of appellate counsel.  _Smith v. Murray_, 477 U.S. 527, 535-36 (1986).  In _Jones v. Barnes_, 463 U.S. 745 (1983), however, the Supreme Court held that the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue.  Effective appellate counsel should " 'winnow out' weaker arguments even though the weaker arguments may be meritorious."  _Heath v. Jones_, 941 F.2d

1126, 1131 (11th Cir. 1991) (quoting Barnes, 463 U.S. at 751-52). Appellate counsel need not assert every potential claim of error, even if his client urges him to do so, but instead should exercise his professional judgment and select only "the most promising issues for review." Barnes, 463 U.S. at 752.

When an ineffective assistance claim is raised, an evidentiary hearing should be granted " '[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief.' " Holmes v. United States, 876 F.2d 1545, 1552-53 (11th Cir. 1989) (quoting 28 U.S.C. § 2255) (alteration in original). However, "this rule does not require that the district court hold an evidentiary hearing every time a section 2255 petitioner simply asserts a claim of ineffective assistance of counsel." Id. at 1553. That is, " '[a] hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations,' " or if " 'the petitioner's allegations are affirmatively contradicted by the record.' " Id. (quoting Guerra v. United States, 588 F.2d 519, 520-21 (5th Cir. 1979)). Likewise, speculative claims of prejudice do not require an evidentiary hearing. Miller v. United States, 2004 WL 1206955, at *2 (11th Cir. Apr. 28, 2004) (unpublished). And, where the evidence presented at trial is

"overwhelming" compared to the contravening evidence that a petitioner alleges his counsel failed to find or introduce, a court may reject the claim for failure to demonstrate prejudice without an evidentiary hearing. Tejada v. Dugger, 941 F.2d 1551, 1559-60 (11th Cir. 1991). Further, no evidentiary hearing is required to dismiss ineffective assistance claims grounded in counsel's failure to raise a meritless motion. Ladd v. Jones, 864 F.2d 108, 110 (11th Cir. 1989).

B. Application

With the above law as a backdrop, the Court will now consider Petitioner's grounds for ineffective assistance of counsel. When deciding a § 2255 Petition without an evidentiary hearing, the Court accepts the allegations in the petition as true. Aron v. United States, 291 F.3d 708, 715 n.6 (11th Cir. 2002). However, those allegations must be "reasonably specific" to merit deference.[45] Id.

---

[45] Generally, a § 2255 Petition is filed pro se and is therefore construed liberally. Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991). However, Petitioner has retained eminent counsel, who has filed an Amended Habeas Petition on Petitioner's behalf. (Doc. 8 at 1.) Therefore, Petitioner is not entitled to the same liberal construction applied to pro se pleadings. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam) (noting that pro se pleadings are held "to less stringent standards than formal pleadings drafted by lawyers").

### i. Failure to Move for Recusal

Petitioner contends that his counsel was ineffective for failing to move for the recusal of Judge Bowen, the trial judge, "even though [his counsel] knew [Judge Bowen] was personally biased against me." (Doc. 1 at 18.) The bias is alleged to stem from Petitioner's opposition to Judge Bowen's appointment and that Judge Bowen was "accused, prior to his nomination, of being a member of private clubs that discriminated on the basis of race."[46] (Doc. 8 at 18.) The Government responds that impersonal allegations of bias cannot form the basis of a motion for recusal. (Doc. 17 at 16.)

Petitioner alleges that his counsel was ineffective for failing to file a motion for recusal under both 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). (Doc. 18 at 8.) As a preliminary matter, it is necessary to distinguish a recusal under 28 U.S.C. § 455(a) from one under 28 U.S.C. § 455(b). Section 455(a) mandates recusal where there is an appearance of impropriety while § 455(b) mandates recusal where "the specific circumstances set forth in that subsection exist,

---

[46] Petitioner contradicts his own Petition in his filings, stating that "Walker's claim does not rest on Judge Bowen's background. Rather, his claim . . . is based on the fact that he actively opposed Judge Bowen's nomination to the bench." (Doc. 18 at 8.) Regardless, the Court will consider both grounds, assuming that Petitioner would not undermine his own argument in this manner.

which show the fact of partiality." United States v. Patti,
337 F.3d 1317, 1321 (11th Cir. 2003).

### a. 28 U.S.C. § 455(a)

"[W]hat matters under § 455(a) 'is not the reality of
bias or prejudice but its appearance.' " Microsoft Corp. v.
United States, 530 U.S. 1301, 1302 (2000) (quoting Liteky v.
United States, 510 U.S. 540, 548 (1994)). "The very purpose
of § 455(a) is to promote confidence in the judiciary by
avoiding even the appearance of impropriety whenever
possible." Liljeberg v. Health Servs. Acquisition Corp., 486
U.S. 847, 865 (1988) (emphasis added). Of course, a judge
appearing to be prejudiced, but not actually prejudiced,
would try the case in exactly the same way as a judge who
neither appears to be prejudiced nor is actually prejudiced.
Thus, even if a § 455(a) motion would have had merit,[47] the
failure to file the motion neither affected Petitioner's
trial nor undermines confidence in its outcome.[48]

---

[47] It is not necessary to decide whether a § 455(a) motion
would have merit, and the Court declines to consider the
question. However, the Court notes that, contrary to
Petitioner's assertion that Judge Bowen recused himself from
this Petition on the basis of Petitioner's opposition to his
nomination, Judge Bowen's recusal order was based on the
appearance of impropriety should he be forced to rule on the
question of his own bias regarding this claim. (Doc. 15 at
2.)
[48] "The performance component need not be addressed first.
'If it is easier to dispose of an ineffectiveness claim on
the ground of lack of sufficient prejudice . . . , that

Accordingly, Petitioner cannot show prejudice for this claim. Strickland, 466 U.S. at 696. Therefore, the claim is **DENIED**.

### b. 28 U.S.C. § 455(b)

Of course, if a § 455(b) motion had merit, it would be possible for Petitioner to show prejudice—assuming he points to tangible, outcome-determinative, biased actions by Judge Bowen. However, Petitioner's claim of ineffectiveness for failure to file a § 455(b) motion fails because the proffered bases for the disqualification are unfounded, making the motion itself meritless.[49] Petitioner's bases for a potential § 455(b) motion are examined in turn.

First, Petitioner asserts that Judge Bowen "had been accused, prior to his nomination, of being a member of private clubs that discriminated on the basis of race." (Doc. 1 at 18.) Judge Bowen was confirmed in 1979, making these unsupported and baseless allegations approximately thirty years old. Ignoring for a moment the antiquated and fallacious nature of this argument, even if Petitioner were

---

course should be followed.' " Smith v. Robbins, 528 U.S. 259, 286 n.14 (2000) (quoting Strickland, 466 U.S. at 697).

[49] Petitioner's claim also fails because he has not identified any biased actions by Judge Bowen that "undermine confidence in the outcome" of the trial. Strickland, 466 U.S. at 694. That is, Petitioner has failed to allege what biased action Judge Bowen took that another "unbiased" judge would not have taken. (Doc. 1 at 18; Doc. 8 at 5.) Without such an allegation, it is impossible to prove prejudice. Holmes, 876 F.2d at 1553 (requiring more than unsupported generalizations buttressing a claim for ineffective assistance of counsel).

factually correct, it has been long established that "an allegation based on the judge's background [that] states no specific facts that would suggest he would be anything but impartial in deciding the case before him" is not the basis for recusal. Parrish v. Bd. Of Comm'rs of Ala. State Bar, 524 F.2d 98, 101 (5th Cir. 1975).[50] Accordingly, a § 455(b) motion brought on this basis would be meritless.

Second, Petitioner alleges bias due to his opposition to Judge Bowen's nomination to the bench some thirty years ago. Judge Bowen, in his recusal order in this case, made clear that Petitioner's opposition to his nomination was an insufficient basis for recusal. (Doc. 15 at 2 n.2 ("My recusal is in no way based upon Section 455(b)(1); in fact, I reject the notion that my recusal is mandated under this subsection.").) And, "[u]nder § 455 'a judge is under an affirmative, self-enforcing obligation to recuse himself sua sponte whenever the proper grounds exist.' " United States v. Disch, 2009 WL 2400243, at *1 (11th Cir. Aug. 05, 2009) (quoting United States v. Kelly, 888 F.2d 732, 744 (11th Cir. 1989)). Accordingly, regardless of whether a motion for recusal was filed at the criminal trial, Judge Bowen was

---

[50] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

under an obligation to consider whether recusal was appropriate. Based on Judge Bowen's failure to recuse himself <u>sua sponte</u> and his order in this case, it is apparent that such a motion would have been denied. And it is equally apparent from this Court's extensive review of the record, both in this case and at trial, that the record conclusively refutes the contention that Judge Bowen acted with bias, making the denial of a § 455(b) motion correct. <u>See</u> Background. Therefore, because this motion would have been meritless, Petitioner cannot demonstrate ineffective assistance. <u>Ladd</u>, 864 F.2d at 110.

For these reasons, any motion for recusal, whether made under 28 U.S.C. § 455(a) or § 455(b) would have been either meritless or had no effect on the outcome of Petitioner's trial. Therefore, this claim is **DENIED**.

## ii. <u>Failure to Move for a Change of Venue</u>

In most of his filings, Petitioner's position as to this claim has been opaque.[51] (<u>See</u> Docs. 1, 8, 9.) Petitioner clarified his position in his Reply Brief:

> Walker has not argued that counsel initially should
> have moved for a change of venue. Rather, he
> argues that, once the government sought to expand
> to a district-wide venire (excluding the Augusta
> Division), and after the court, without basis,

---

[51] Part of the confusing nature of this claim is that Petitioner, at his trial, actually <u>opposed</u> a motion by the Government to change venue. <u>See</u> <u>supra</u> Background III.

> granted that request (including the Augusta Division), thus diluting the number of blacks in the jury pool, counsel should have moved for a change of venue to rectify the consequences of the Judge's wrong and prejudicial decision.

(Doc. 18 at 10-11.) This statement elucidates Petitioner's contentions that his counsel should have filed a motion for a change of venue based on pretrial publicity in the worst possible light. (Doc. 9 at 6-7.) That is, Petitioner argues that his trial counsel should have filed a disingenuous motion, with the hidden purpose of making the jury pool as African-American as possible.

First, this claim fails because the underlying motion was meritless. Based on their latest positions in this case, everyone agrees that the pretrial publicity was not sufficient to trigger Federal Rule of Criminal Procedure 21(a). The Government states that a change of venue would have been inappropriate. (Doc. 17 at 18.) At trial, Petitioner argued that pretrial publicity was not pervasive enough to trigger Rule 21(a) (CR104-059, Doc. 59) and that position has not changed (Doc. 9 at 6-7; Doc. 18 at 10-11).[52] And, contrary to Petitioner's belief, Judge Bowen never held

---

[52] Petitioner's current position is that Judge Bowen was incorrect to rule that pretrial publicity required extension of the jury pool, but, given that flawed ruling, it was ineffective for Petitioner's trial counsel not to further exacerbate the perceived error. (Doc. 9 at 6-7; Doc. 18 at 10-11.)

that publicity required a change of venue.[53]  (CR104-059, Doc. 93 ("I find that the Government's motion to draw a district-wide venire excluding the Augusta Division is too speculative to give this Court a sound basis to exclude persons who live in the same judicial division in which a large part of the alleged criminal acts occurred.").)  Accordingly, as all sides agree that a Rule 21 motion was meritless—an agreement in which this Court joins—trial counsel was not ineffective for failing to make such a motion.[54]  Owens v. Sec'y for Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009).

Second, and independently, Petitioner cannot show prejudice because the record clearly shows an unbiased jury. Petitioner makes no specific allegations, seeming to allege only general racial bias on the part of the jury.[55] (Docs. 1,

---

[53] Indeed, if Judge Bowen felt that pretrial publicity triggered Rule 21, it is axiomatic that he would have excluded the Augusta division from the jury pool. (See CR104-059, Doc. 93.)

[54] To the extent Petitioner is arguing that his meritless motion would have been erroneously granted by Judge Bowen, rendering his counsel ineffective for failing to make a motion that would have been granted contrary to appropriate legal standards, that argument is foreclosed by Strickland. 466 U.S. at 695. That is, Petitioner "has no entitlement to the luck of a lawless decisionmaker." Id.

[55] Underlying this argument appears to be the assumption that unless a certain percentage of the jury is African-American, Petitioner has been denied the right to trial by an unbiased jury. However, Petitioner "has no right to a 'petit jury composed in whole or in part of persons of his own race.' " Batson v. Kentucky, 476 U.S. 79, 85 (1986) (quoting Strauder v. West Virginia, 100 U.S. 303, 305 (1880)).

8.)  Even had he asserted bias on the part of an individual juror, that contention would be conclusively dispelled by the record, which shows an intensive voir dire process with dismissals for cause of all jurors showing any hint of bias against Petitioner.  See supra Background III.  For the same reason, the fanciful allegations of a racially biased jury are affirmatively contradicted by the record, which reflects a racially mixed jury[56] that Petitioner inexplicably presumes was biased.[57]  See id.

Petitioner cannot show deficient performance on the part of his counsel for failing to raise a meritless motion. Owens, 568 F.3d at 915.  And, Petitioner's claims of prejudice by a biased jury lack supporting factual allegations and are conclusively refuted by the record.

---

[56]  Prejudice within the jury is to be distinguished from prejudice on the part of prosecuting authorities.  Compare Batson, 476 U.S. at 85-86 (noting that when a state purposefully excludes members of a certain race from a jury the state violates the equal protection clause), with Raulerson v. Wainwright, 753 F.2d 869, 875 (11th Cir. 1985) (discussing the possibility that pretrial publicity may make it impossible to impanel an impartial jury).  Currently, Petitioner is not alleging racial bias by the Government in the selection of the jury, which could occur in the face of a racially mixed jury, but instead argues that the individual jurors were racially biased.

[57]  Due to the requirement of unanimity for a criminal conviction, Petitioner's contention of racial bias by jurors is odd given that it implies not only racism on the part of the nine Caucasian jurors, but also on the part of the three African-American jurors.

<u>Holmes</u>, 876 F.2d at 1552-53. Accordingly, this claim is **DENIED**.

### iii. <u>Failure to Interview and Impeach Witnesses</u>

Petitioner alleges that his counsel was ineffective for failing to interview or properly investigate with respect to the Focus counts, the Grady counts, the MCG counts, and the CSRA counts. (Doc. 8 at 6-7.) Further, Petitioner argues that his counsel failed to use grand jury testimony to impeach Joyce Harris, Fred Benjamin, Dot Ealy, and Nadine Thomas. (<u>Id.</u> at 7.) The Government responds that its evidence at trial was overwhelming, and that Petitioner's allegations are too general to support claims for ineffective assistance. (Doc. 17 at 20-21.) The Court considers each allegation in turn.

### a. <u>Focus Counts</u>

With respect to the Focus counts, Petitioner contends that his counsel should have presented evidence as to the manner in which weekly newspapers determined readership, focusing specifically on the ratios between readership and circulation. (Doc. 8 at 5.) Petitioner cannot show prejudice with respect to this alleged error for two reasons.[58]

---

[58] "The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on

56

First, evidence of readership to circulation ratios was presented during trial. This evidence was introduced through Frank Lane, a former circulation manager at the Focus, who testified that the readership number for an African-American weekly paper was 4.5 persons per paper. (CR104-059, Doc. 156 at 2013.) Also, Mr. Lane informed the jury that when he told Petitioner the Focus needed to change its terminology from circulation to readership, the Focus complied. (Id.) Further, the subject was discussed on cross-examination. (Id., Doc. 155 at 401.) Because trial counsel introduced the complained of evidence, introduction of additional evidence concerning the same facts would have been cumulative. Prejudice cannot be shown for a failure to introduce cumulative evidence. See, e.g., White v. Mitchell, 431 F.3d 517, 530 (6th Cir. 2005) ("The presentation of Dr. Kandiko's findings to the jury would have been cumulative, and therefore, White cannot establish prejudice by relying on this affidavit."), Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003) (rejecting ineffective assistance of counsel claim where complained of unintroduced evidence was largely cumulative), Carriger v. Lewis, 971 F.2d 329, 332-34 (9th

the ground of lack of sufficient prejudice . . . , that course should be followed.' " Robbins, 528 U.S. 259 at n.14 (quoting Strickland, 466 U.S. at 697).

Cir. 1992) ("The failure to raise Dunbar's felony convictions a second time does not amount to ineffective assistance."), Jones v. Smith, 772 F.2d 668, 674 (11th Cir. 1985) (rejecting claims of ineffective assistance for failure to introduce evidence where the same evidence was presented by other witnesses).

Second, the allegedly omitted evidence would have been irrelevant. The Government's theory of the case, proved at trial, was that Petitioner charged advertisers based on fraudulent circulation numbers. (CR104-059, Doc. 154 at 51-52.) The Government never contended that Petitioner provided fraudulent readership[59] numbers. Therefore, evidence of the industry standard pertaining to readership numbers is irrelevant to the factual basis of Petitioner's conviction. As this evidence is irrelevant, it does not create a reasonable probability that the result of the trial would have been different had it been presented. Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696.

Because the evidence Petitioner contends should have been introduced was both cumulative and irrelevant, Petitioner cannot show prejudice. Kimmelman, 477 U.S. at

---

[59] Readership numbers and circulation numbers are distinct concepts, and it is possible to provide fraudulent numbers with respect to either readership or circulation numbers only. See Habhab, 132 F.3d at 412.

375, Strickland, 466 U.S. at 696, Crosby, 339 F.3d at 1279. Further, the evidence presented by the Government with respect to these Counts was overwhelming. And, the probative value of this "missing" evidence would have been severely limited by its irrelevant and cumulative nature, further proscribing Petitioner's ability to show prejudice. Tejada, 941 F.2d at 1559-60. Therefore, this claim is **DENIED**.

### b.   CSRA Counts

With respect to the CSRA counts, Petitioner alleges a bevy of evidence that should have been introduced, including FBI coercion of a witness, employee theft from the CSRA, CSRA losses caused by donation of free tickets and concessions, CSRA procedures for granting scholarships, similar events' failures to generate revenue from ticket sales, and Savannah State University's profits. (Doc. 8 at 5-6.) However, again, this evidence would have been largely cumulative, duplicating evidence of free tickets, free concessions, scholarship procedures, and thefts of cash by CSRA employees. (CR104-059, Doc. 156 at 1957, 1968, 1970-71, 2049-51, 2080, 2096, 2122-23, 2133-35, 2161-62, 2182; id., Doc. 157 at 2218, 2238, 2242, 2254-56, 2259, 2275-77, 2278, 2282-84, 2332, 2349-53, 2356-58.)[60]   Or, the evidence would have been

---

[60] For a more specific breakdown of this testimony see supra Background.

irrelevant. For example, whether other charity events make money on ticket sales casts no light on whether this event made money on ticket sales. Or, the absent evidence would have lacked sufficient probative value in light of the overwhelming nature of the Government's case. That is, it is difficult to see how one witness's testimony that she felt pressured to inculpate Petitioner would have turned the tables in light of the thirty-six other witnesses who testified to his various acts of corruption with respect to the CSRA. Finally, this evidence does not begin to address the aspects of the scheme involving the use of BL's restaurant, the checks to cash, and various other individual schemes comprising the multifaceted pillaging of the CSRA proved by the Government at trial.

Here, as before, the evidence on these counts was overwhelming and the evidence Petitioner believes should have been introduced was irrelevant, cumulative, insufficient, or a combination of the three. After a careful review, the Court finds that even with the evidence of which Petitioner complains, there is not a reasonable probability that the result of the trial would be different. Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696, Crosby, 339 F.3d at 1279, Tejada, 941 F.2d at 1559-60. Accordingly, Petitioner cannot show prejudice and this claim is **DENIED**.

c.   Grady Counts

Petitioner contends that his counsel was ineffective for failing to introduce evidence "that other not-for-profit hospitals were doing business with Georgia Personnel; that hospitals across the country were outsourcing non-core functions; and that Grady's outsourcing was the result of market forces, and not political manipulations." (Doc. 8 at 6-7.)   Again, this evidence was largely presented to the jury.   (CR104-059, Doc. 155 at 1262, 1285, 1312-13, 1328; id., Doc. 156 at 1828-33.)   Or, it lacks sufficient probative value in light of the overwhelming nature of the Government's case.   See supra Background.   That is, Petitioner does not explain how proof of relationships with other hospitals would rebut the mountain of evidence[61] indicating that the relationship between GPS and Grady was politically motivated. (Doc. 8 at 7.)

After careful consideration, the Court finds that the evidence in question does not create a reasonable probability

---

[61] The evidence on this Count was staggering.   Testimony presented at trial established that Grady's CEO met with Petitioner while the bill was in Petitioner's Committee and subsequently hired GPS (CR104-059, Doc. 155 at 1203, 1209-10, 1237-39, 1303-05, 1321), Grady used a phony bidding process to award GPS work (id. at 1242-43, 1301-05), Grady continued to use GPS in spite of deficient performance (id. at 1322-24), and Grady accrued repeated large losses by using GPS in place of Grady's in-house temp service (id. at 1240-41, 1246-47, 1257-58).

that the result of the trial would have been different. Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696, Crosby, 339 F.3d at 1279, Tejada, 941 F.2d at 1559-60. Accordingly, this claim is **DENIED**.

### d. MCG Counts

Petitioner asserts that his trial counsel was deficient for failing to elicit testimony at trial that no political pressure was applied to MCG and that no check was presented from Crothall[62] to Petitioner.[63] (Doc. 8 at 5-7.) From this argument, it is unclear whether Petitioner has read the same record as this Court.[64] That is, Petitioner was convicted of misrepresenting his ownership share in GPS and the Focus to MCG, not of applying political pressure to MCG or receiving

---

[62] Crothall is a hospital services provider. See Crothall Services Group, http://www.crothall.com/ (last visited January 05, 2010).

[63] Petitioner's pleadings, which are not afforded the same liberal construction as those of a pro se litigant, contain no mention of where political pressure on MCG or a payment from Crothall appears in the trial record. (See Docs. 1, 8, 9, 18.) Likewise, there is no explanation of how this evidence would have impacted Petitioner's trial. (See Docs. 1, 8, 9, 18.) Petitioner's inadequate presentation of this issue is, on its own, sufficient to require dismissal of this claim. Smith v. Sec'y Dep't of Corr., 572 F.3d 1327, 1352 (11th Cir. 2009).

[64] The trial transcripts contain no mention of Crothall writing checks to Petitioner, or Petitioner applying political pressure to MCG. Indeed, Petitioner's trial counsel stated at sentencing that Crothall "never came up at the trial." (CR104-059, Doc. 191 at 241.)

payments from Crothall.[65] (CR104-059, Doc. 1 at 27-32.) Proof of these latter points would have no bearing on the Government's proof of Petitioner's fraud as to his ownership of GPS and the Focus.

Here, again, the Government's evidence was overwhelming,[66] and the evidence that Petitioner contends should have been proffered was specious.[67] That is, even

---

[65] Crothall was mentioned briefly at sentencing as part of a challenge to the presentence investigation report. (CR104-059, Doc. 191 at 241.) However, Petitioner's trial counsel conceded that the issue had "zero impact on the [guideline] range" and was raised only "for the Court's consideration." (Id.) Moreover, Petitioner has not even hinted at the idea that he was prejudiced by the failure to introduce this evidence at his sentencing. Accordingly, the Court assumes that Petitioner does not mean to assert prejudice with respect to sentencing, but rather with respect to his trial— the same prejudice he has generally asserted with respect to all of his other claims for failure to investigate/call a witness. (See Doc. 9 at 8.) To the extent Petitioner intends this specific claim of ineffective assistance to relate to sentencing rather than trial, that claim is insufficiently presented here and is **DISMISSED**. Smith, 572 F.3d at 1352.

[66] Not only was there ample testimony covering this fraud, (CR104-059, Doc. 154 at 600-01; id, Doc. 156 at 1346-49, 1354, 1361-66), Petitioner's misrepresentations were documented by the lawyer for MCG, who kept meticulous records of all correspondence between MCG and Petitioner (id., Doc. 156 at 1342-66).

[67] As mentioned, Petitioner has not explained the relevance of this evidence to this case, and from the record the import of the evidence is far from clear. See supra notes 62, 63. Even assuming that this evidence was introduced, in light of overwhelming evidence of Petitioner's guilt and relevant conduct contained in the record, the Court finds that the evidence would have impacted neither the result of Petitioner's trial nor his sentencing. Kimmelman, 477 U.S. at

considering the record, as the Court does, with the assumption that such evidence was introduced does not create a reasonable probability that the result of the trial would have been different. Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696, Tejada, 941 F.2d at 1559-60. Therefore, prejudice cannot be shown and this claim is **DENIED**.

### e.  Failure to Impeach

Petitioner alleges that his trial counsel was ineffective for failing to impeach Joyce Harris, Fred Benjamin, Dot Ealy, and Nadine Thomas. (Doc. 8 at 7.) Petitioner does not identify any specific testimony that should have been challenged, instead making only the conclusory assertion that these witnesses could have been impeached. (Id.)

Petitioner's assertions on this count fall short. Nadine Thomas testified that her inculpatory testimony of Petitioner in front of the grand jury was mistaken (CR104-059, Doc. 156 at 1207-11); Joyce Harris was impeached both with inconsistent statements (id. at 1267-70) and her bitterness towards her former employer (id. at 1273-75); and Fred Benjamin was impeached by trial counsel based on his grand jury testimony (id., Doc. 155 at 608-09). Accordingly,

---

375, Strickland, 466 U.S. at 696, Tejada, 941 F.2d at 1559-60.

it is unclear what additional impeachment of these witnesses would have accomplished. It is clear, however, that additional impeachment would not have affected the result of the trial, meaning that Petitioner cannot show prejudice. Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696.

This leaves Dot Ealy as the only witness Petitioner complains of that was not impeached at trial. However, her testimony was only one of sixty-six witnesses in this case and was simply not that significant. (Id. at 462-92.) Even discounting her testimony entirely, given the testimony of the other sixty-five witnesses and the mountains of documentary evidence in this case, it cannot be said that her impeachment would have created a reasonable probability that the result of the trial would have been different. Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696, Tejada, 941 F.2d at 1559-60. Therefore, prejudice cannot be shown and this claim is **DENIED**.

### iv. Failure to Object to Trial Schedule

Petitioner contends that his counsel was ineffective for "fail[ing] to object to the onerous trial schedule which left the lawyers fatigued and ineffective."[68] (Doc. 1 at 19.) However, Petitioner does not address this claim in his brief

---

[68] This claim was incorporated by reference into the Amended § 2255 Petition. (Doc. 8 at 4.)

in support of his § 2255 claim.  (Doc. 9.)  The Government responds that there was no ground to object because all attorneys were operating under the same trial schedule. (Doc. 17 at 24.)

Petitioner fails to sufficiently allege prejudice to support this claim.[69]  That is, Petitioner has not identified any act, or failure-to-act, by his counsel due to fatigue that may have affected the outcome of his trial.  (Docs. 1, 8, 9, 18.)  Having failed to allege prejudice, this claim cannot be sustained.  Kimmelman, 477 U.S. at 375, Strickland, 466 U.S. at 696.  Accordingly, this claim is **DENIED**.

### v.   Failure to Appeal Sentencing Analysis

Petitioner contends that both his trial and appellate counsel were ineffective for failing to argue that the trial judge did not explicitly mention the 18 U.S.C. § 3553(a) factors when departing upwards and failing to argue that the sentence was substantively unreasonable. (Doc. 1 at 19, Doc. 8 at 7, Doc. 9 at 9-11.)  A review for reasonableness is subject to procedural and substantive review.  Gall v. United States, 552 U.S. 38, 51 (2007).  Gall further provides that the procedural reasonableness inquiry examines the sentencing

_____

[69] "The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed.' "  Robbins, 528 U.S. at 286 n.14 (quoting Strickland, 466 U.S. at 697).

court's explanation of the § 3553(a) factors while the substantive reasonableness inquiry examines whether the resulting sentence was sufficiently justified in light of the § 3553(a) factors. Id.

### a. Procedural Reasonableness

The crux of Petitioner's procedural reasonableness argument is that "an explanation of how each of the Section 3553(a) factors played into the sentencing decision is required."[71] (Doc. 8 at 9-11.) In this regard, Petitioner is mistaken. As the Eleventh Circuit has explained, "[b]ecause we review the totality of circumstances, a district court need not discuss each Section 3553(a) factor, although '[w]here the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so.'" United States v. Pugh, 515 F.3d 1179, 1191 n.8 (11th Cir. 2008) (quoting

---

[71] 18 U.S.C. § 3553(a) contains seven factors that a Judge should consider during sentencing: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence for criminal conduct, protect the public from further criminal action by the defendant, and provide defendant with needed training; (3) the kinds of sentences available; (4) the sentence and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities between similar defendants convicted of similar crimes; and (7) the need to provide restitution.

Rita v. United States, 551 U.S. 338, 357 (2007)) (alteration in original) (first internal quotes omitted); see also United States v. Turner, 474 F.3d 1265, 1281 (11th Cir. 2007).

In this case, there is no procedural unreasonableness because Judge Bowen mentioned many of the § 3553 factors even if he did not identify them by specific code section. For example, Judge Bowen engaged in a lengthy discussion of the history and character of the Petitioner (Doc. 191 at 287-91 (discussing Petitioner's character and value to his community)) and the nature and circumstances of the offense (id. at 292)—a discussion of § 3553(a)(1). Judge Bowen also discussed § 3553(a)(2) by considering the need to promote deterrence, protect society by removing Petitioner, provide just punishment, and engender respect for the law. (Id. at 296.) Section 3553(a)(4) was also extensively discussed, and Judge Bowen even mandated a recalculation of the guideline range. (Id. at 293-95.) Also, § 3553(a)(7) was considered, as Petitioner was ordered to pay restitution.[72] (Id. at 299-300.) Similarly, Judge Bowen considered § 3553(a)(3) when he reflected on the presentence report and entertained the parties' arguments with respect to

---

[72] ordering restitution constitutes consideration of this factor. See United States v. Tebrugge, 134 Fed. App'x 291, 302 (11th Cir. May 17, 2005) (unpublished) ("The court also considered the need to provide restitution in ordering [the defendant] to pay restitution . . . .").

sentencing.[73]  (Id. at 284, 293.)  And Judge Bowen explicitly
put the reason for the upward departure on the record,
stating that:

> I have never seen the grouping features of
> guidelines work to the extent that only one scheme,
> the CSRA Classic counts, are actually recognized
> for the criminality that it presents.  It cannot be
> said that these schemes were so alike that the
> criminal conduct or the operative facts in the
> indictment under each scheme melted one into the
> other. . . . [I]n my mind the entirety of the
> criminal conduct of this defendant Mr. Walker is
> not sufficiently represented by the Classic group
> of counts and the grouping of the numbers under the
> Federal Sentencing Guidelines.

(Id. at 294-95.)  This passage also reflects consideration of
the factor in § 3553(a)(6).  See United States v. Richardson,
2009 WL 3809626, at *5 (11th Cir. Nov. 16, 2009)
(unpublished).

The record is clear that Judge Bowen considered the 18
U.S.C. § 3553(a) factors.  Therefore, Defendant's resulting
sentence was not procedurally infirm, rendering Petitioner's
challenge meritless.  Because counsel cannot be ineffective
for failing to raise a meritless issue, Ladd, 864 F.2d at
110, this claim is **DENIED**.

----

[73] Consideration of the presentence investigation report and
parties arguments for departures constitutes consideration of
18 U.S.C. § 3553(a)(3).  Turner, 474 F.3d at 1281 ("[T]he
court's consideration of the PSI and the parties' arguments
concerning the sentence to be imposed reflects a
consideration of the kinds of sentences available."
(internal quotations omitted)).

### b. Substantive Reasonableness

Petitioner argues his appellate counsel was ineffective for not arguing that the resulting sentence was substantively unreasonable.[74] (Doc. 8 ¶ 14.) As a result of appellate counsel's ineffectiveness, Petitioner claims that he received a sentence "40% more than the minimum and more than 10% more than the maximum [Guidelines]."[75] (Doc. 59 at 5.) Petitioner argues that "there could be no reasonable strategic basis for failing to challenge the reasonableness of this non-Guidelines sentence." (Id. at 8.)

Petitioner also alleges his appellate counsel was objectively unreasonable for failing to challenge the substantive reasonableness of the advisory non-Guideline

---

[74] On remand, the Court asked for limited briefing only on the issue of substantive reasonableness. Plaintiff's Memorandum of Law (Doc. 59) mischaracterizes the scope of this limited briefing to include procedural, not substantive, claims—namely, errors surrounding "honest services" fraud, grouping effects, and explanation of the § 3553(a) factors. This Court has already found that it is not persuaded by any argument advanced by Petitioner that the sentencing judge's alleged procedural failure to apply the sentencing factors rendered Petitioner unable to assess the substantive application of the factors to the sentence. (Doc. 57 at 3 n.2.)

[75] While such percentages may be illustrative, they are not determinative. The Supreme Court in Gall held that relying on a mathematical approach to determine reasonableness is problematic and that quantifying a variance does not properly weigh relevant factors. Gall 552 U.S. at 47-48. To wit, Petitioner's 121-month sentence is only .69% of the maximum penalty of 1,452 years possible based on his 127 convicted counts. (CR104-059, Doc. 191 at 255.)

sentence imposed upon Petitioner. (Doc. 59 at 4.) Further, Petitioner claims Judge Bowen incorrectly engaged in a pre-Booker departure, not a post-Booker variance, and appellate counsel was ineffective for failing to raise this on appeal.[76] The Government contends that Petitioner's appellate counsel did not render constitutionally ineffective assistance because counsel properly focused on more significant claims instead. (Doc. 60 at 1.)

The sentencing court "shall impose a sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), and "make an individualized assessment based on the facts presented." Gall, 552 U.S. at 597. A sentence is substantively unreasonable if the district court unjustifiably relies on any one § 3533(a) factor, " 'selects the sentence arbitrarily, bases the sentence on impermissible factors [or] fails to consider pertinent section 3553(a) factors.' " Pugh, 515 F.3d at 1191-92 (quoting United States v. Ward, 506 F.3d 468, 478 (6th Cir. 2007)).

In reviewing a sentence for substantive reasonableness, the Court must "examine the totality of the circumstances and determine whether the sentence achieves the sentencing goals stated in 18 U.S.C. § 3553(a)." United States v. Saac, 632

---

[76] Any reasonableness claim regarding Petitioner's appellate counsel is subject to plain-error review. United States v. Bonilla, 579 F.3d 1233, 1238 (11th Cir. 2009).

F.3d 1203, 1214 (11th Cir. 2011); see also United States v. Irey, 1160, 1189-90 (11th Cir. 2010) (en banc). Where a district court decides that "an outside-Guidelines sentence is warranted, [the reviewing court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."[77] Gall, 552 U.S. at 50; see also Pugh, 515 U.S. at 1190; United States v. Agbai, 497 F.3d 1226, 1230 (11th Cir. 2007) (citations omitted); Rita, 551 U.S. at 2468 ("The sentencing judge should set forth enough to [demonstrate] that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."). It follows naturally then that "a major departure should be supported by a more significant justification than a minor one." Gall, 552 U.S. at 50.

Where the court finds there are "aggravating or mitigating circumstances," or factors "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," the court may impose a sentencing outside the guidelines range. See 18. U.S.C.

---

[77] "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007) (quotation marks and citation omitted); see also United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006).

§ 3553(b)(1).    When   reviewing   the   reasonableness   of   a
sentence outside the Guidelines range a reviewing court "may
take the degree of a variance into account and consider the
extent of a deviation from the guidelines." Id. at 47.
Reviewing courts are not limited only by the specific factors
expounded   upon   by   the   district   court   when   reviewing
substantive reasonableness of sentences.   Booker, 543 U.S. at
261; see also Pugh, 515 F.3d at 1193-94.   "Section 3553(a)
'remains in effect, and sets forth numerous factors that
guide sentencing. Those factors in turn will guide appellate
courts, as they have in the past, in determining whether a
sentence is unreasonable.' " Id.; see also United States v.
Talley, 431 F.3d 784, 786 (11th Cir. 2005) (citing United
States v. Scott, 426 F.3d 1324 (11th Cir. 2005)).   A sentence
must   be   vacated   for   substantive   unreasonableness   if   a
reviewing   court   is   "left   with   the   definite   and   firm
conviction that the district court committed a clear error of
judgment in weighing the § 3553(a) factors by arriving at a
sentence that lies outside the range of reasonable sentences
dictated by the facts of the case." Irey, 612 F.3d at 1190;
see also United States v. Hernandez, 423 F. App'x 869, 870
(11th Cir. 2011).

The   Eleventh   Circuit   has   routinely   affirmed   above-
Guidelines sentences as substantively reasonable where the

sentencing court explained the sentence and weighed the pertinent § 3553(a) factors.[78]  See United States v. Quesada-Ramos, 429 F. App'x 909, 914 (11th Cir. 2011) (affirming above Guidelines 115-month sentence as substantively reasonable where Guidelines range of 78 to 97 months because district court compellingly explained and considered sentencing range, § 3553(a) factors, and § 3553(c) statements); United States v. Housley, 413 F. App'x 192, 196 (11th Cir. 2011) (finding above Guidelines sentence of 120-months from range of 63 to 78 months substantively reasonable after considering § 3553(a) factors because district court determined upward variance necessary); United States v. Sharma, 407 F. App'x 401, 404 (11th Cir. 2011) (finding 60-month sentence, above 41-month high-end of Guidelines, substantively reasonable after district court explained decision to apply upward variance based on § 3553(a) factors, including nature and circumstances of offenses, seriousness of offenses, need for just punishment and deterrence, and need to protect public from further crimes); United States v. Joseph, 410 F. App'x 177, 178 (11th Cir. 2010) (affirming

_____

[78]  Ironically, nearly all cases finding substantive unreasonable sentences were appeals by the Government arguing that a sentence was unreasonably too low.  See, e.g., United States v. Jayyousi, 657 F.3d 1085, 1116-17 (11th Cir. 2011); Irey, 612 F.3d 1160; Livesay, 587 F.3d 1274, 1277-79 (11th Cir. 2009); Pugh, 515 F.3d at 1182.

district court's above-Guidelines sentence as substantively reasonable because district court offered several reasonable bases for deviation); <u>United States v. Sanchez</u>, 586 F.3d 918, 934 (11th Cir. 2009) (affirming sentence as substantively reasonable where district court applied both upward departure and an upward variance based on criminal history, imposing a 200-month prison sentence where guideline range before upward departure was 130 to 162 months); <u>United States v. Shaw</u>, 560 F.3d 1230, 1236-37 (11th Cir. 2009) (upholding sentence as substantively reasonable where district court relied on several § 3553(a) factors, imposing 120-month sentence where guideline range called for 30 to 37 months). A review of those factors as to Petitioner's sentence follows.

In the present case, Petitioner's sentencing lasted for a day and a half. Petitioner, Petitioner's counsel, and the Government were all given opportunities to be heard on all of the sentencing issues raised. (CR104-059, Doc. 191 at 284.) From the outset, Judge Bowen noted a "need for some appropriate societal response" when determining Petitioner's sentence. (CR104-059, Doc. 191 at 12-13.) In other words, Judge Bowen concluded that the Guidelines sentence would not

sufficiently or adequately address the sentencing goals of § 3553(a).[79]

As a result of this determination, Judge Bowen weighed the § 3553(a) factors and explained the basis for his deviation. Petitioner is correct that Judge Bowen never referenced specific § 3553(a) code sections when discussing the factors.[80] (Doc. 59 at 2-3.) During the sentencing, however, Judge Bowen properly weighed and considered all pertinent § 3553(a) factors. (CR104-059, Doc. 191 at 12-13, 284, 295, 289-90, 293, 294-95.) Judge Bowen observed that

---

[79] In his supplemental brief, Petitioner argues Judge Bowen did not properly engage in " 'the departure analysis' mandated by the sentencing statutes and the Guidelines themselves." (Doc. 59 at 6.) While an argument concerning the procedures used by a trial judge in fashioning a sentence more properly addresses a sentence's procedural reasonableness, the unavailing nature of Petitioner's argument warrants discussion. Judge Bowen unequivocally stated that his sentencing decision was not a guided departure: "I have chosen not to go through the analysis of a guided departure as suggested by the prosecutor. I have chosen to examine in my own mind and to determine, apart from the guidelines, but advised by guidelines, where a sentence should be imposed." (CR104-059, Doc. 191 at 295.) Detrimental to Petitioner's argument is that the Eleventh Circuit has expressly found such departures permissible. See United States v. Eldrick, 443 F.3d 783, 788 n.2 (11th Cir. 2006) (finding that district court did not treat decision to sentence [Defendant] above guideline range as upward departure, but rather as exercise of discretion because "the court did not cite to a specific guidelines departure provision and, in the words of the district court, the guidelines did not adequately take into account the severity of the damage of the defendant's conduct").
[80] Again, Petitioner's argument concerning a failure to address the factors goes to the procedural reasonableness, not substantive.

"the entirety of the criminal conduct of [Petitioner] is not sufficiently represented by the Classic group of counts and the grouping of the numbers under the Federal Sentencing Guidelines." (CR104-059, Doc. 191 at 295.) This statement goes to the crux of the § 3553(a)(1) and § 3553(a)(2)(A) factors—requiring consideration of the nature and circumstance of the offense, the need to reflect the seriousness of offense, and to provide just punishment. Thus, Judge Bowen provided sufficiently compelling reasons for his disagreement with the applicable Guidelines range. See, e.g., Pugh, 515 F.3d at 1191-92 (quotations omitted); United States v. Williams, 557 F.3d at 1256; United States v. Vautier, 144 F.3d at 762.

Furthermore, Judge Bowen justified an above Guidelines sentence by stating he was "troubled by the way in which the various groups of the offenses in the indictment were arranged." (CR104-059, Doc. 191 at 294.) Judge Bowen observed that there were many separate schemes involving public corruption, misuse of position as state official, falsification of information, and simple thievery. (CR104-059, Doc. 191 at 289-90.) Judge Bowen found that, under the grouping effect of the Guidelines, "what results in an indictment like this is that the most serious definable

criminal activity becomes the major and controlling group."
(CR104-059, Doc. 191 at 290.)

Based on that grouping effect, Judge Bowen reasoned that
"[the most serious definable criminal activity] rise[s] above
[the other groups] or we might say to some extent eclipses
them." (CR104-059, Doc. 191 at 290.) Therefore, "the most
culpable activity as defined in the guidelines, because of
the grouping, is essentially that activity upon which a
sentence is based." (Id.) In fact, the court "ha[d] never
seen the grouping of features of guidelines work to the
extent that only one scheme, the CSRA Classic counts, [is]
actually recognized for the criminality it presents." (CR104-
059, Doc. 191 at 294-95.) Thus, Judge Bowen's additional
justifications clearly contemplated not only § 3553(a)(1)
factors, but also § 3553(a)(2)(A).

Moreover, Judge Bowen further justified Petitioner's
above-Guidelines sentence because "[a]ll of these things
having been considered and especially the need for an example
or deterrence for others who might be similarly inclined
under the same or similar circumstances," a sentence "above
the range called for by the guidelines is appropriate."
(CR104-059, Doc. 191 at 296.) See 18 U.S.C. § 3553(a)(2)(B);
see Pugh, 515 F.3d at 1194-95 (discussing that general
deterrence is one of the key purposes of sentencing). Again,

Judge Bowen recognized the need for "assessing, weighing, and determining the appropriate societal response for conduct which is proscribed by federal law." (CR104-059, Doc. 191 at 288-89.) Petitioner's above-Guidelines sentence was precisely that—an appropriate sentence thoroughly and reasonably justified by specific facts under federal law and the relevant § 3553(a) sentencing goals.

The sentence also adequately reflected two related factors of § 3553(a)(3) and § 3553(a)(4)—kinds of sentences available and the sentencing range. Unlike the Court in Pugh, which determined that the district court did not give "any real weight to the Guidelines range in imposing the sentencing," 515 F. 3d at 1200, Judge Bowen extensively considered and calculated the appropriate Guidelines range (CR104-059, Doc. 191 at 284) and used it as a "guidepost set of directions for the Court to use in the employment of its discretion." (CR104-059, Doc. 191 at 293). Indeed, Judge Bowen noted that his non-Guidelines sentence was "advised by the Guidelines" (CR104-059, Doc. 191 at 295.) Further, Petitioner has not provided any evidence that the sentencing court unjustifiably relied on any one § 3553(a) factor, selected the sentence arbitrarily, or relied on any impermissible factors. Judge Bowen explained compellingly, with individualized particulars of the present case, why the

guideline sentence did not address fully the pertinent § 3553(a) sentencing factors and then exercised his discretion as sentencing judge to impose a sentence that comported with § 3553(a)'s sentencing goals. See Irey, 612 F.3d at 1190; Hernandez, 423 F. App'x at 870.

Taking into account the degree to which Judge Bowen departed upward relying on these specific findings, this Court is unable to conclude that Judge Bowen's sentence was substantively unreasonable. While the Court still believes that Petitioner's arguments address procedural unreasonableness, this Court also fails to find any substantive unreasonableness in the sentence. Judge Bowen adequately supported the reasons for Petitioner's above guidelines sentence and it was within Judge Bowen's discretion to increase the sentence based on the particular justifications he provided. This court is not left with a definite or firm conviction that Judge Bowen committed a clear error of judgment in weighing the § 3553(a) factors during sentencing. See Irey, 612 F.3d at 1190. Thus, the sentence was substantively reasonable. Because counsel cannot be ineffective for failing to raise a meritless issue, Ladd, 864 F.2d at 110, this claim is **DENIED**.[81]

_____

[81] Even assuming that the sentence was substantively unreasonable, appellate counsel was not ineffective. Given

Ultimately, however, the sentencing court exercised its discretion reasonably and compellingly, justifying the bases for an upward Guideline variance. Furthermore, the sentence imposed was substantively reasonable. As a result, Petitioner's sentence was not substantively infirm, rendering Petitioner's challenge meritless.

vi. Failure to Argue that 18 U.S.C. § 1346 was Unconstitutional as Applied

Petitioner contends that his counsel was ineffective for failing to argue that 18 U.S.C. § 1346, the honest services statute, was unconstitutional as applied.[82] (Doc. 8 at 7.) Petitioner further alleges that many of the schemes—the Grady

---

the abundance of case law affirming upward-Guideline variances as substantively reasonable, see supra Analysis II.A, appellate counsel employed his professional judgment to 'winnow out' that argument on appeal, believing the likelihood of success to be low and knowing there were clearly stronger, more "promising issues for review." Barnes, 463 U.S. at 754; see Robbins, 528 U.S. at 288. Only when an ignored appellate issue is clearly stronger than those presented can a presumption against deficient performance be overcome. Robbins, 528 U.S. at 288. Therefore, appellate counsel's performance was not deficient because, given the extremely high burden and precedent, there is no reasonable probability that the results would have been any different had the issue been directly raised on appeal. See Kimmelman, 477 U.S. 365, 375 (1986); see also Strickland, 466 U.S. at 696. Appellate counsel's decision not to pursue any substantive reasonableness claims does not undermine confidence in the outcome because there has been no showing of any deficient performance or prejudice. See Strickland, 466 at 694; Lightbourne, 829 F.3d at 1022.

[82] How the statute was unconstitutional as applied is wholly unexplained by Petitioner's filings. (Docs. 1, 8, 9, 18.)

Memorial, Medical College of Georgia, and political campaign counts—could not justify a variance because, after _Skilling v. United States_, 561 U.S. ____, 130 S. Ct. 2896 (2010), they do not constitute federal crimes. (Doc. 59 at 10.) Yet, Petitioner has unsuccessfully challenged these convictions in two separate proceedings. One of these proceedings was brought pursuant to 28 U.S.C. § 2241 in the District Court for the District of South Carolina. (Doc. 60 at 12 n.3.) The district court found that _Skilling_ had no effect on Petitioner's convictions. (_Id._) In a separate proceeding, Petitioner previously sought permission from the Eleventh Circuit to file a successive habeas petition in light of _Skilling_. Emergency Application for Leave to File Successive Motion to Vacate Sentence, _In re Walker_, No. 10-13755 (11th Cir. Aug. 12, 2010). The Eleventh Circuit denied the request finding that the "claim fails because the Supreme Court has not made either of these direct appeal cases retroactive to cases on collateral review." _In re Walker_, No. 10-13755, at 2 (11th Cir. Sept. 3, 2010). Therefore, the Eleventh Circuit has already determined that the Supreme Court's ruling in _Skilling_ does not apply retroactively to Petitioner's collateral attack on his conviction or sentence.

Even so, Petitioner has failed to explain how appellate counsel was ineffective for failing to argue substantive

unreasonableness based upon <u>Skilling</u> where <u>Skilling</u> had yet to be decided at the time of Petitioner's appeal. Counsel cannot be ineffective for failing to raise a meritless motion. <u>Ladd</u>, 864 F.2d at 110. Therefore, this claim is **DENIED**.

CONCLUSION

For the foregoing reasons, the § 2255 Petition and the request for an evidentiary hearing are **DENIED**. (Doc. 8.) Additionally, because Petitioner's claim of selective prosecution is procedurally defaulted, the Motion for Discovery is **DISMISSED AS MOOT**. (Doc. 2.) The **Clerk of Court** is **DIRECTED** to **CLOSE THIS CASE**.

SO ORDERED this 5th day of March 2012.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA